**Jules J. EXNICIOUS, Plaintiff-Appellant,**

v.

**UNITED STATES of America,**
**Defendant-Appellee.**

**No. 75–1931.**

United States Court of Appeals,
Tenth Circuit.

Argued and Submitted Sept. 24, 1976.

Decided Sept. 19, 1977.

Rehearing and Rehearing In Banc
Denied Nov. 7, 1977.*

* Judge McWilliams voted to grant rehearing by the panel.

Blaine A. Rutenbeck, Denver, Colo., for plaintiff-appellant.

Carolyn J. McNeill, Asst. U. S. Atty., Denver, Colo. (James L. Treece, U. S. Atty. and Richard J. Spelts, First Asst. U. S. Atty., Denver, Colo., on the brief), for defendant-appellee.

Before HOLLOWAY and McWILLIAMS, Circuit Judges, and CHRISTENSEN, District Judge.**

HOLLOWAY, Circuit Judge.

Plaintiff Jules Exnicious appeals from the dismissal of his action against the United States under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671 *et seq.* (1970), to recover damages for injuries resulting from the alleged malpractice of doctors employed by the Veterans Administration (VA). Plaintiff asserts two basic claims: (1) that a permanent left shoulder disability he suffered was caused by surgery being performed while plaintiff had a streptococcal pharyngeal infection;[1] and (2) that the shoulder disability was also negligently diagnosed as traumatic or degenerative arthritis rather than necrosis.[2]

The trial court granted summary judgment for the Government. Essentially the court concluded that the plaintiff in May, 1972, discovered the "acts" constituting the alleged malpractice, that this was more than two years before filing of his administrative claim under 28 U.S.C. § 2401(b),[3] and that the action is thus time barred.

---

** Honorable A. Sherman Christensen of the District Court of Utah, sitting by designation.

1. Dr. Anderson examined the medical records and stated that the major elective surgery on the shoulder was performed at a time too soon after stopping treatment with known possibility of streptococcus. (II R. 21)

2. The complaint in the action alleges that various diagnoses of the shoulder condition have been made, *i. e.*, septic necrosis, aseptic necrosis and avascular necrosis. (XI R. 29).

3. Plaintiff's claim was received by the VA on July 10, 1974, and after it was denied he instituted this action in the district court within the specified six months after denial of the administrative claim. 28 U.S.C. § 2401(b) (1970).

In 1959 plaintiff was admitted to the VA Hospital in Houston, Texas, where he underwent a closed manipulation of his left shoulder and a surgical procedure known as a Bankart arthroplasty[4] for correction of frequent shoulder dislocation. A second closed manipulation was performed in March, 1960, after considerable pain and difficulty following the first procedure. Plaintiff contends that sometime prior to the first surgery he had contracted a streptococcal pharyngeal infection and that the VA physicians did not delay the surgery for sufficient time after treating this infection. (XI R. 28). As a result, plaintiff claims that his shoulder was infected, which ultimately led to necrosis of the left humerus. (XI R. 29, 31–33).

Plaintiff asserts that it was not until about August 1 or 2, 1972, that he was first made aware of the diagnosis of his condition as necrosis[5] and that the VA's 1960 diagnosis of traumatic arthritis was incorrect, and that he later learned his condition may have been attributable to infection. (XI R. 85–86). He says that it was not until February, 1974 (when Dr. Wells questioned him about whether he had been ill shortly before the 1959 surgery) that he first had an indication that his shoulder problem could be related to his 1959 operation. (XI R. 101–02). For these reasons plaintiff maintains that the filing of his administrative claim was not untimely.

The details concerning the plaintiff's awareness of his claim will be developed later in discussing the limitations question.

## I

### The limitations principles

Section 2401(b) provides in relevant part:

A tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues   .   .   .

The issue is whether it was proper for the trial court to grant summary judgment on the question of when Exnicious' claim accrued within the meaning of this section.[6] The federal courts generally follow the rule that a claim for malpractice accrues when the claimant discovers, or in the exercise of reasonable diligence should have discovered, the alleged malpractice. *Casias v. United States*, 532 F.2d 1339, 1340 (10th Cir.); *Quinton v. United States*, 304 F.2d 234, 240 (5th Cir.); *Reilly v. United States*, 513 F.2d 147, 148 (8th Cir.); *Portis v. United States*, 483 F.2d 670, 672 n.5 (4th Cir.); *Ashley v. United States*, 413 F.2d 490, 492 (9th Cir.); *Brown v. United States*, 353 F.2d 578, 579–80 (9th Cir.). Limitations should not bar a claimant before he has a reasonable basis for believing he has a claim. Therefore until a claimant has had a reasonable opportunity to discover *all* of the essential elements of a possible cause of action for malpractice—damages, duty, breach and causation—his claim against the Government does not accrue.[7] *Bridgford v. United States*, 550 F.2d 978, 981–82 (4th

---

**4.** The Bankart procedure is described in Orr's Operations of General Surgery (4th ed. 1968), 648–649; The Craft of Surgery (2d ed.), 1831–1836; Operative Surgery (2d ed.), Vol. 8, 145; and Lewis' Practice of Surgery (rev. ed. 1975), Orthopedics, Vol. 2, ch. 8, 21–23. The object is to re-attach the subcapularis muscle capsule (membrane encasing the muscle below the shoulder blade) and the glenoid labrum (fibrocartilage in the shoulder blade socket) to the bony anterior glenoid margin (the forward part of the rim of the shoulder blade socket). The operation involves the drilling of 3 or 4 suture holes in the anterior glenoid margin. Ibid.

**5.** See IV R. 47, 71.

**6.** The question is one of federal law. *Reilly v. United States*, 513 F.2d 147, 148 (8th Cir.), and

cases there cited; but see *Tessier v. United States*, 269 F.2d 305, 309 (1st Cir.).

**7.** For example, even though a person was informed that there was a mistake in his medical treatment, he may not be aware that he has suffered damages as a result of the mistake. *E. g., Bridgford v. United States*, 550 F.2d 978, 982 (4th Cir.). On the other hand, a person may be quite aware of damages but may be unable to learn the cause of his condition and hence whether it is related to earlier medical treatment. *E. g., Portis v. United States*, 483 F.2d 670, 673 (4th Cir.). Or the person may be aware of his injury and perhaps connect it with prior medical treatment but may be totally ignorant as to what occurred during his treatment and whether or not it conformed to ac-

Cir.). And where a claimant is given a "credible explanation" of his condition not pointing to malpractice, he may not be found to have failed to exercise reasonable diligence because he did not earlier pursue his claim. *Jordan v. United States*, 503 F.2d 620, 624 (6th Cir.).

With these principles in mind we first consider the trial court's opinion and the basis it cites for the summary judgment, and the plaintiff's position on the appeal from the judgment.

## II

### The trial court's analysis and the plaintiff's position on the appeal

In its opinion granting summary judgment for the Government the trial court stated that the question was whether the plaintiff discovered or in the exercise of reasonable diligence should have discovered the acts constituting malpractice before July 10, 1972.[8] The court stated (XI R. 124–25):

And while we might well conclude that plaintiff should have discovered these acts by May 1961 in the exercise of reasonable diligence, our ruling is based upon the fact that plaintiff actually did discover the acts constituting the malpractice (whether interpreted to be the 1959 operation alone or taken together with the 1960 diagnosis) on May 2, 1972 in his consultations with Drs. Fischer and Granberry.

Thus, the court's primary holding was that plaintiff had actual knowledge of acts constituting malpractice in May, 1972, from the consultation with Dr. Fischer and Dr. Granberry.

In addition, however, the court concluded that the plaintiff's claim was barred due to constructive knowledge more than two years before filing of his administrative

cepted medical practice. *E. g., Tyminski v. United States*, 481 F.2d 257, 263–64 (3d Cir.).

**8.** The trial court refers to the date of July 10, 1972, as controlling in that the receipt of the claim by the Veteran's Administration occurred on July 10, 1974. The court said that plaintiff

claim. In that connection the court first noted there must be discernible some legally cognizable injury or damage, even though the ultimate damage is unknown or unpredictable. The court said the plaintiff had reason to believe, even in March, 1960, when he was first given a diagnosis of traumatic arthritis, that "a trauma (and trauma includes surgery) had coincided with a negligent act and that some damage (including terrific pain and greater lack of mobility than had been predicted) had resulted." (XI R. 123).

Second, the court noted that there must be available sufficient facts to place the plaintiff on notice, actual or constructive, that the medical procedures were improper and could constitute malpractice. In this connection the court stated that plaintiff was on notice of an unexpected and grave result "of the trauma of surgery" and that the medical procedures could constitute malpractice. The court noted that the diagnosis (traumatic arthritis) itself gave indication of its possible etiology, and that the pain and lessening of mobility placed the plaintiff on constructive notice that arthritis was not the proper diagnosis. (Id. at 123).

Third, the court noted that the causal relationship between the damage and the defendant's acts must be discovered or at least discoverable by plaintiff through reasonable investigation. In this respect the court said that the relationship between the surgery and the resulting injury was made known to plaintiff by the 1960 diagnosis of "traumatic arthritis," reiterated by a statement of Dr. Granberry in 1972. (Id. at 124). Thus, in connection with the question of constructive notice the court repeatedly stressed the fact that a "traumatic arthritis" diagnosis was given to the plaintiff in 1960 and that plaintiff had increasing severity of pain and lessening of mobility

filed his claim on June 27, 1974, with the VA and the plaintiff alleges this also. Plaintiff's brief addressed the July 10, 1972, date as the significant one. (Brief for the Plaintiff-Appellant, 1–2, 6, 9). In either event our conclusion is the same.

which put him on constructive notice that arthritis was not the proper diagnosis.

The plaintiff vigorously challenges this reasoning underlying the trial court's ruling. Essentially he argues that he was given a "credible explanation" of his condition by the VA doctor's 1960 diagnosis of traumatic arthritis, citing *Jordan v. United States, supra,* 503 F.2d at 624; that he should not be held to have been on notice of the necrosis diagnosis and of its infectious origin at a time when the physicians had not so diagnosed his condition; and that the notice and duty to inquire about the connection between his strep throat infection and his deformed shoulder did not arise until after he was advised of such a possibility. He says this occurred in 1974 after he consulted with Dr. Wells in Denver. (Brief for the Plaintiff-Appellant 3, 5). Hence plaintiff contends that his administrative claim was timely and that the dismissal on limitations grounds was error.

These contentions lead us to the record and the medical history which it outlines.

### III

*The summary judgment record*

The depositions, exhibits, pleadings and answers to interrogatories in the summary judgment papers develop these principal facts:

Plaintiff had no high school or college education. He did pass a General Education Development test, given by the military services to persons wanting to further their education. It represents the equivalent of high school education. (IV R. 9–10).

In 1951 plaintiff received a football injury while in the Service when his left arm was "thrown out of joint." This was the first trouble he had with either shoulder. (Id. at 11). He did not have dislocation problems after that until about 1959. While working for a contractor he slipped on a scaffold and tried to support himself with his left arm. Plaintiff could not recall the doctor to whom he was sent about this problem. (Id. at 12–13).

Six or eight months later he went to the VA hospital in Houston. His shoulder was manipulated under anesthesia and then the Bankart arthroplasty was performed. This was in February, 1959. Before the operation plaintiff was told he "would have a limited motion without any pain or without any more dislocations." (Id. at 16, 20).

After the surgery the prediction proved incorrect. The pain never left but became "increasingly more profound." Plaintiff testified he did not have this pain prior to surgery. (Id. at 21). After the cast was removed there was a different pain like having "two bones rubbing together, which has been the constant pain I have had over the years." This pain in the left humerus has gotten much worse over the years. (Id. at 25–27).

Some nine months or a year later he felt there was something wrong and the pain became unbearable in 1960. (Id. at 28–31). He was re-admitted to the VA hospital in February, 1960, and a Dr. Donovan examined him and said that arm "is almost froze." (Id. at 36). Although this doctor wanted to see his X-rays, an emergency developed and apparently he did not see them. Plaintiff was given daily physical therapy. A Dr. Jackson also saw him during this visit to the hospital and at his discharge gave him a diagnosis of "traumatic arthritis," saying he had "strings of arthritis." Plaintiff asked about the prognosis and he replied "well, you're still a young man." Plaintiff made no inquiry about that comment. (Id. at 39–40).

There were some visits to other doctors in the several years that followed but the next significant medical consultations were in 1972. Plaintiff stated in his deposition that in 1972 the pain became unbearable and he called the Harris County Medical Society and asked them to recommend an arthritic specialist, and they suggested a Dr. Fischer. (IV R. 44). On April 27, 1972, plaintiff went to Dr. Fischer (VII R. 5), and X-rays were taken of his upper spine and shoulders. Dr. Fischer explained to him that his left humerus had deteriorated, contrasting the film of his left shoulder with that of the right. A visit with an orthopedic specialist,

Dr. Granberry of the same clinic, was recommended. Plaintiff testified that Dr. Fischer did not indicate he did not have arthritis. (IV R. 55–56).

Plaintiff saw Dr. Granberry on May 2, 1972. Dr. Granberry went over Dr. Fischer's X-rays. During this visit Dr. Granberry recommended a fusion, but plaintiff said this was "out of the question." (Id. at 56–57). Plaintiff did not ask him about the cause of the deterioration of the shoulder. (Id. at 57). Dr. Fischer and Dr. Granberry indicated to him he had a "dead bone." Plaintiff said that the thinking of Dr. Fischer and Dr. Granberry when they showed him the "dead bone" was that he had had traumatic arthritis "all these years," and plaintiff testified that he had no reason to suspect anything else. (Id. at 80–81).

Plaintiff said he was confused; he had heard of rheumatoid arthritis "tearing up joints and deforming joints . . ." All he knew was he had a "dead bone and a dead joint." (Id. at 59). Dr. Granberry commented on the 1959 surgery by saying "I'm sure glad that all of our operations don't turn out like this" and that it was a "bad operation." (Id. at 68–69). However according to their depositions, Dr. Fischer and Dr. Granberry did not relate plaintiff's shoulder condition to infection, did not reveal an etiology connected with the 1959 surgery, and did not discuss the theories of the negligence claims made by plaintiff. (VII R. 26–27, 35).

An insurance form dated July 27, 1972, was completed by a secretary at the clinic where Dr. Fischer and Dr. Granberry practiced. It noted the diagnosis of "1) Tendinitis right shoulder 2) Aseptic necrosis left shoulder." Plaintiff says that it was not until he saw a copy of this form around August 1 or 2, 1972, that he knew he had anything but arthritis. (IV R. 47, 71).

Plaintiff stated by deposition that he went back to his office the day of his visit with Dr. Fischer and Dr. Granberry. He told Miss Dobraski, his office manager, that he had a "dead bone" and that "[m]y joint

is dead." (Id. at 58–59). In her deposition, she said that there was a general comment by plaintiff on one occasion that his condition was more serious than what he thought was wrong with his shoulder. (VIII R. 9).

Miss Dobraski testified further that plaintiff worked at the same company where she was employed from 1968 until July 28, 1972. They discussed their arthritis for "quite a few years" and during these conversations he thought he had arthritis. He made complaints such as "my arthritis is really bothering me today" when speaking of his trouble with his shoulder and arm. (Id. at 7, 22).

Plaintiff's affidavit states that his first indications of an infectious origin of the shoulder problem, and that the problem was related to the 1959 operation, came from a February, 1974, visit with Dr. Wells. (XI R. 101–02). The depositions of Dr. Wells, and of Dr. Anderson later seen, developed the first explanation in the record of the plaintiff's claims relating to infection and some support for the theory from the VA medical records concerning plaintiff. In that connection we note that the Government admitted that the plaintiff was treated for suspected pharyngeal streptococcal infection approximately six days before his February, 1959, surgery. (II R. 16; III R. 2).

## IV

### Conclusion

We must consider whether, under the standards of Rule 56, F.R.Civ.P., there was no genuine issue as to any material fact and whether the Government was entitled to judgment as a matter of law. The summary judgment papers must be viewed in the light most favorable to the party opposing the motion and we must consider factual inferences in the light most favorable to the existence of such issues. *National Aviation Underwriters, Inc. v. Altus Flying Service, Inc.*, 555 F.2d 778, 784 (10th Cir.).[9] The movant must demonstrate en-

---

**9.** In connection with review of the summary judgment record we note that, contrary to the

Government's contention, our review is not made to determine whether findings are "clear-

titlement beyond a reasonable doubt, and if an inference can be deduced from the facts on which the opposing party might recover, summary judgment is inappropriate. *Mustang Fuel Corp. v. Youngstown Sheet & Tube Co.,* 516 F.2d 33, 36 (10th Cir.). In a case like this, it must appear conclusively from the record that the claimant knew or should have known of the alleged malpractice at a time beyond the limitations bar for summary judgment to be granted. *Hulver v. United States,* 393 F.Supp. 749, 754 (W.D.Mo.).

■ We are persuaded that the record does not support a summary judgment against the plaintiff. *First,* we cannot agree with the trial court that on receiving the 1960 diagnosis of traumatic arthritis, plaintiff had reason to believe even then that a trauma ("and trauma includes surgery") had coincided with a negligent act and some damage had resulted; that he knew of the acts constituting malpractice— "the operation," and had facts sufficient to alert a reasonable person that there may have been negligence; and that as a "credible explanation," the traumatic arthritis diagnosis contained seeds of an admission of some untoward aspect of the surgery, re-establishing the duty to investigate. (XI R. 123).

It is true that "trauma" has been defined as "an injury (as a wound)," to living tissue, with the example of surgery being given. Webster's Seventh New Collegiate Dictionary (1967), 942. The medical definition has been simply stated as "a wound or injury, whether physical or psychic," without a reference to surgery. Dorland's Illustrated Medical Dictionary, 25th ed. (1974), 1633. Nevertheless, in view of plaintiff's history of an earlier football injury and his fall on a scaffold, it is difficult to hold that the diagnosis pointed to the surgery and to possible negligence connected with it, instead of other possible injuries and etiology.

■ It could reasonably be inferred by a fact-finder that the "traumatic arthritis" diagnosis did not put plaintiff on notice that the surgery or negligence connected with it caused the problem. When different ultimate inferences may be drawn, the case is not one for summary judgment. *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176; *Webb v. Allstate Life Ins. Co.,* 536 F.2d 336, 339 (10th Cir.). By citing the one meaning of trauma relating to surgery and the surgery incident alone from plaintiff's history, in effect the court rejected other reasonable inferences and decided a disputed fact issue. *Hanna v. United States Veterans' Administration Hospital,* 514 F.2d 1092, 1095 (3d Cir.). We reach the same conclusion as did the *Hanna* decision that summary judgment based on limitations was in error.

*Second,* what we have said also explains our conclusion that reliance on the traumatic arthritis diagnosis by plaintiff as a "credible explanation," *Jordan v. United States, supra,* 503 F.2d at 624, cannot be rejected by a summary judgment ruling. As in *Jordan,* the plaintiff's condition after the operation may have been unusual and unexpected, but there was nothing which conclusively showed that a traumatic arthritis diagnosis could not reasonably have been accepted as a credible explanation of plaintiff's condition, with no indication that there was negligence in connection with the VA surgery.

■ Severe worsening of arthritis was not an impossible explanation. That arthritis was actually believed by plaintiff to have been the problem is supported by Miss Dobraski's testimony to this effect covering the 1968–1972 period (VIII R. 7, 22), and by plaintiff's testimony that even at the time of the May, 1972, consultations with Dr. Fischer and Dr. Granberry when they discussed the "dead bone" and "deterioration," he had no reason to suspect anything but arthritis (IV R. 80–81). In any event the record is such that a determination of credi-

ly erroneous" under the standard which applies after trial and entry of findings pursuant to Rule 52, F.R.Civ.P. *National Aviation Under-*

*writers, Inc. v. Altus Flying Service, Inc., supra,* 555 F.2d at 781 n. 6. The standard is that of Rule 56.

bility is involved, which precludes a summary disposition. *Riggs v. British Commonwealth Corp.,* 459 F.2d 449, 451 (10th Cir.).

*Third,* we are unable to agree with the primary holding of the trial court "that plaintiff actually did discover the acts constituting malpractice (whether interpreted to be the 1959 operation alone or taken together with the 1960 diagnosis) on May 2, 1972, in his consultations with Drs. Fischer and Granberry." (XI R. 124–25).

Admittedly, there were statements made about "dead bone" and a "bad operation" in these consultations. Nevertheless, Dr. Fischer's deposition states that he had no conversation with plaintiff regarding a possible infectious cause of his problems and no conversation with him that negligence at the time of his surgery was a possible cause of his condition. (VII R. 35). The record shows no investigation by these doctors of the facts concerning the possibility that plaintiff had had an infection followed by surgery at an unreasonably early date. And plaintiff's affidavit states that it was not until February, 1974, when Dr. Wells inquired about infection, and he recalled his sore throat shortly before the operation, that he had his first indication that his shoulder problem could be related to the 1959 operation. (XI R. 101–02).

We are mindful that a long period of time has passed since the 1959 surgery, which the trial court stressed. This factor, however, cannot remove fact questions remaining about the reasons for delay in plaintiff's assertion of his claim. Those questions as to when plaintiff had a reasonable opportunity to discover all the elements of a possible cause of action—duty, breach, causation and damages (*Bridgford v. United States, supra,* 550 F.2d at 981-82) —are not so conclusively removed that summary judgment is proper. The humane purposes of the statute allowing the suit are not served by barring a claim if delay resulted from "blameless ignorance." See *Urie v. Thompson,* 337 U.S. 163, 170, 69 S.Ct. 1018, 93 L.Ed. 1282.

Accordingly, the summary judgment must be vacated and the case is remanded for further proceedings.

McWILLIAMS, Judge, dissents.

I respectfully dissent and subscribe to the reasoning and the result reached by the trial court in its Memorandum Opinion and Order of September 15, 1975.