Joseph Anthony **CAMIRE**, infant by his father, James Anthony Camire and his mother, Gail Marie Camire, and James Anthony Camire and Gail Marie Camire, Individually, Plaintiffs,

v.

**UNITED STATES of America,**
**Defendant.**

**No. 74–CV–501.**

United States District Court,
N. D. New York.

May 23, 1980.

## MEMORANDUM—DECISION
## AND ORDER

PORT, Senior District Judge.

Basing jurisdiction on the Federal Tort Claims Act, the infant plaintiff, born November 27, 1970, and his parents instituted suit against the United States for four million dollars damages alleged to result from the malpractice of a United States Air Force physician. The alleged negligence consisted of the misdiagnosis and treatment of meningitis as a cold and teething during the infant's treatment at the Plattsburgh Air Force Base Hospital (Plattsburgh) from April 15 to April 22, 1971 and the resultant delay until April 27, 1971 in receiving appropriate treatment at the United States Naval Hospital at Balboa, California (Balboa). The treatment at Balboa is not faulted by the plaintiffs.

Chief Judge Foley granted summary judgment dismissing the plaintiffs' complaint for lack of jurisdiction on the ground that the notice of claim filed on January 17, 1974 was not timely. The plaintiffs sought to avoid the bar of the two-year filing requirement by a contention that the claim accrued within the two-year period as required by the statute.[1] They contended under the "continuing treatment" theory that the claim did not accrue until February 1973 because of subsequent care rendered the infant at Plattsburgh after the correct diagnosis at Balboa. They alternatively contended that the claim did not accrue until July 1973 when the mother was advised by the attorney of a possible malpractice action.

On appeal, the Court of Appeals sustained the dismissal based on the "continuing treatment" theory but reversed and remanded because the majority thought "that on the record before the court a genuine issue of material fact existed, as to when a reasonable person in the position of the

Livingston L. Hatch, Keeseville, N. Y., for plaintiffs.

George H. Lowe, U. S. Atty., Syracuse, N. Y., for defendant; Terrence M. Kelly, Asst. U. S. Atty., Albany, N. Y., of counsel.

---

1. The limitations provision applicable to tort claims against the United States provides:

 A tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues or

unless action is begun within six months after the date of mailing, by certified or registered mail, of notice of final denial of the claim by the agency to which it was presented.

28 U.S.C.A. § 2401(b).

child's mother should have realized that negligent malpractice had occurred." *Camire v. United States*, 535 F.2d 749, 751 (2d Cir. 1976) (Mansfield, J., dissenting).

On remand, a trial was held limited solely to the question of when the plaintiffs' claim accrued and the related issues concerning the timeliness of the filing of the claim. After the trial of these issues and while the case was sub judice, I withheld consideration of it, with the consent of the parties, pending the determination in the Supreme Court of *United States v. Kubrick*, 444 U.S. 111, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979).

After the decision of *Kubrick* the parties were given an opportunity to submit memoranda giving their views of the effect of *Kubrick* on the facts developed in this case. It was

> the position of the plaintiff that [*Kubrick*] in no way affects the present matter under consideration. . . . It would appear from Kubrick's decision that the Court must decide from the facts in an individual case when the claimant knew of the malpractice or should have known, giving consideration to their knowledge and the facts that were presented to the claimant.

Continuing their post-*Kubrick* argument, plaintiffs somewhat ambiguously state:

> It would be at that time that the full extent of the injuries and damage to the infant concerning the hearing and eyes, were presented to the claimants, which was not until June of 1972, when the civilian doctor, Dr. Davis, suggested the malpractice. The notice of claim was filed within 2 years of discovery of the malpractice.

■ Plaintiffs also, without claiming that it results in the tolling of the statute, referred to the infancy of the plaintiff Joseph Anthony Camire. Unfortunately, in an action such as this, the statute of limitations is not tolled by infancy. *Mann v. United States*, 399 F.2d 672, 673 (9th Cir. 1968); *Camire v. United States*, No. 74–CV–501 (N.D.N.Y. Oct. 10, 1975), affirmed in part and reversed, remanded in part on other grounds, 535 F.2d 749 (2d Cir. 1976).

The Government contends that the facts bring the case within the rationale of *Kubrick*. Echoing the sentiments of Judge Mansfield: "Sympathetic as I am to the plight of parents and child, I find no rational basis whatever for avoiding a clearly applicable rule of law," *Camire, supra*, 535 F.2d at 751, requiring the dismissal of plaintiffs' complaint in accordance with the holding of *Kubrick*.

The trial revealed little more of the material facts concerning the accrual issue than were disclosed in the papers submitted to Judge Foley on the dismissal motion. Familiarity with Judge Foley's Memorandum-Decision and Order and the opinion of the Court of Appeals is assumed. The facts are repeated only as required for the determination of the matter before me.

On April 15, 1971 the infant plaintiff was taken to the Plattsburgh Air Force Base Hospital (Plattsburgh) with a high fever, vomiting, convulsions and persistent crying. The infant was seen at the hospital by Capt. Donald Marger, M.D., who diagnosed the ailment as "cutting teeth and a cold." Treatment was continued on the basis of that diagnosis until April 26, 1971, when the doctor gave his permission to Mrs. Camire to take the infant to California where his father was serving in the Navy. Upon arrival at San Diego the child's mother brought him to the United States Naval Hospital at Balboa, California with the same symptoms he had displayed at Plattsburgh. The child was immediately recognized by the doctors at Balboa as a very sick child. A consent was obtained from the mother for a spinal tap to test for meningitis. She admitted that she was told that the baby may have had meningitis. She was told that the baby was so sick that she should have the child baptized and the last rites administered immediately, which was done. Upon cross-examination she was asked if she had not been told by the doctor at Balboa that the child had meningitis in an advanced stage of three or four weeks. Initially she denied that this information was given to her. However, she later testified that "he [the doctor] could have said

it—very possibly could have said it." A statement that this information was given to her was also included in her notice of claim dated December 10, 1973. I find that the infant's mother knew by early May 1971, when the child was being treated at Balboa, that he was suffering from meningitis in an advanced stage of three or four weeks and that he was critically ill. The baptism and last rites given to the child are eloquent testimony to the fact that she understood that the child was suffering from something far more serious than a cold or teething.

After the child's release from Balboa, he was seen as an outpatient there and at a naval installation at Long Beach, California for the rest of the summer and fall on a regular basis. During that period the mother became aware that the child's hearing and sight were impaired. She also was advised that he had some brain damage. The child's father received the same information through observation, or from his wife or the doctors. The parents also noticed that during the summer and fall of 1971 the child failed to develop normally. He was described by the mother as acting like "a newborn infant" just home from the hospital. During the months from August to November 1971 the parents noticed that the child was not walking, crawling or sitting up, that he had no interest in toys, and that he had a vision and hearing deficiency. Treatment was continued at Plattsburgh by a government physician on her return there in April 1972. He referred the child for examination to a Dr. Jerome Davis, a civilian. Mrs. Camire claims that Dr. Davis gave her the first and only information she had received that the child's abnormal condition was the result of the failure to initially diagnose properly the meningitis at Plattsburgh with its resultant delay in receiving appropriate treatment. She further claims that on a visit to her attorney in July 1973 to discuss the possibility of procuring social security benefits for her son, the attorney explored the possibility of a malpractice action. This was the plaintiffs' first realization of such a potential remedy.

The notice of claim in this case was filed with the Department of the Air Force on January 17, 1974. The administrative claim was denied on August 9, 1974 and the action was commenced by filing the complaint with the Clerk on December 3, 1974.

Compliance with 28 U.S.C. § 2401(b) is a jurisdictional prerequisite which must be established by the plaintiff in order to avoid a dismissal. *See Ashley v. United States*, 413 F.2d 490, 492 (9th Cir. 1969); *Hammond v. United States*, 388 F.Supp. 928, 930 (E.D.N.Y.1975) (citing cases). *See also DeWitt v. United States*, 593 F.2d 276, 281 (7th Cir. 1979). If the plaintiffs' claims are to survive the time bar, they must establish that the claims did not accrue more than two years before January 17, 1974. This they have failed to do. It affirmatively appears from the evidence before me that the claims accrued, under no circumstances, no later than the fall of 1971.

At the close of the proof and prior to the decision in *Kubrick*, the plaintiffs, relying chiefly on *Exnicious v. United States*, 563 F.2d 418 (10th Cir. 1977), asserted the limitations period did not start to run until July 1973 when plaintiffs claim they became aware of the possible existence of a medical malpractice claim against the Government as a result of a conversation with their lawyer. Such a claim, post-*Kubrick*, is completely without support. *See United States v. Kubrick*, 444 U.S. at 121 n. 8, 100 S.Ct. at 359 n. 8.

Alternatively, plaintiffs push the triggering date back to June 1972 when they claimed Dr. Davis pinned the fault for the child's debilitated condition on the failure to promptly and correctly treat the child at Plattsburgh.

The general rule under Section 2401(b) is that an action accrues at the time of plaintiff's injury. This rule was liberalized in *Quinton v. United States*, 304 F.2d 234 (5th Cir. 1962) through the application of the "blameless ignorance" theory of *Urie v. Thompson*, 337 U.S. 163, 170, 69 S.Ct. 1018, 1024, 93 L.Ed. 1282 (1949) to a mal-

practice claim. *Quinton* held "that a claim for malpractice accrues against the Government when the claimant discovered, or in the exercise of reasonable diligence should have discovered, the acts constituting the alleged malpractice." 304 F.2d at 240 (footnote omitted). Under the "blameless ignorance" theory a plaintiff is held blameless for ignorance of a condition which until his claimed discovery was "unknown and inherently unknowable," *Urie, supra,* 337 U.S. at 169, 69 S.Ct. at 1024 (knowledge of silicosis which was not evident until its diagnosis years after its causation). *See also Quinton, supra,* 304 F.2d at 235 (plaintiff transfused with RH Positive blood instead of RH Negative which could not be discovered until pregnancy over three years later).

Applying the *Quinton* rule and the "blameless ignorance" principle to the facts of this case, in spite of the natural sympathetic motivations that urge otherwise, the action must be dismissed as time-barred.[2]

To withhold the commencement of the running of the limitations period until the conversation with Dr. Davis in June 1972 under the facts disclosed would render section 2401(b) meaningless.

From April 15, 1971 until about April 22, 1971 the infant was diagnosed as having, and was treated for, a cold and teething with the ordinary and usual medications employed in the treatment of those simple infancy ailments. On April 26, 1971 the infant's mother, a high school graduate of average intelligence, was permitted by the Plattsburgh physician to take the child to California. In sharp contrast to the diagnosis and treatment at Plattsburgh, when the child was taken by the mother to the Balboa hospital with the same symptoms he exhibited at Plattsburgh, he was immediately recognized as a critically ill child, possibly suffering from meningitis. A formal consent to a spinal puncture for a meningitis test was requested of and granted by the mother. The infant's condition was sufficiently critical that the attending physician suggested to the mother that the child be baptized and the last rites administered which was done.

While "blameless ignorance" can be attributed to the period the child was being attended at Plattsburgh initially under a teething-and-cold diagnosis, it is *hard* to apply it to the period after arrival at Balboa with a diagnosis of meningitis of three or four weeks duration, coupled with the information and treatment of the child as critically ill. It is *impossible* to extend the period of triggering of the statute of limitations to a point beyond the fall of 1971 when the plaintiff parents were in possession of knowledge that the child (1) was suffering from a severe sight and hearing loss and a brain injury, (2) had not developed as a normal child, and (3) at almost one year of age was acting as "a new born infant" just home from the hospital.

With knowledge of these facts, to do as the plaintiffs contend should be done—*i. e.,* delay the commencement of the statute of limitations until the plaintiffs were explicitly told by Dr. Davis that the child's condition resulted from the misdiagnosis at Plattsburgh—would eviscerate the statute.

With knowledge of this bundle of facts, it is not reasonable that the claim would not accrue until the plaintiffs fortuitously received the volunteered information from Dr. Davis[3] that this obviously severely injured child's condition resulted from the improper diagnosis and treatment of which plaintiffs complain. This might not have occurred for another ten or twenty years. The facts possessed by the plaintiffs should have suggested the possibility of cause and effect. In any event, they were more than sufficient to alert them, in the exercise of reasonable diligence, to seek advice. To paraphrase *Kubrick*:

---

**2.** If relief can be afforded this unfortunate family by means other than by creating "the bad law made by hard cases," I certainly would endorse it.

**3.** Dr. Davis had no recollection, nor did his records contain any note of having given this

information to the plaintiffs. He was consulted for treatment of the child, not for an opinion of the propriety of the initial treatment. Even if the information was sought, it was sought too late. *See Kubrick, supra,* 444 U.S. at 121, 100 S.Ct. at 359.

A plaintiff such as [Camire], armed with the facts about the harm done to him, can protect himself by seeking advice in the medical and legal community. To excuse him from promptly doing so by postponing the accrual of his claim would undermine the purpose of the limitations statute, which is to require the reasonably diligent presentation of tort claims against the Government.

at 123, 100 S.Ct. at 360 (footnote omitted). The necessity of exercising diligence in order to benefit from the "blameless ignorance" rule is recognized in the *Kubrick* dissent as well: "A plaintiff who remains ignorant through lack of diligence cannot be characterized as 'blameless'." At 128, 100 S.Ct. at 362 (Stevens, J. dissenting).

The facts in *Kubrick* are not precisely the same as the facts here. In *Kubrick*, the Government had no reason to question the date when the plaintiff discovered the possible cause of his deafness, which was related to the neomycin treatment. For statute of limitations purposes, they could and did concede that plaintiff Kubrick became aware of his injury and its probable cause when he was given this information by Dr. Sataloff. In this case, the Government makes no such concession with reference to the June 1972 conversation with Dr. Davis.

This was not a case of a hidden condition or one of great complexity. If the condition of the child resulted from misdiagnosis, improper treatment and delay in proper treatment, the causation announced itself to the parents clearly and loudly not later than the fall of 1971. After that time their failure to seek advice cannot be excused as "blameless ignorance."

This memorandum shall constitute the court's findings of fact and conclusions of law. For the reasons herein, it is

ORDERED, that the claims herein be and they hereby are barred for failure to timely file an administrative claim, pursuant to the provisions of 28 U.S.C. § 2401(b) and it is further

ORDERED, that the complaint herein be and the same hereby is dismissed.