**JASON WINTER'S HERBALTEA (BA-HAMAS) LTD. et al., Plaintiffs,**

v.

**FLEMMING IMPORTS CORPORATION et al., Defendants.**

**Civ. A. No. 79 C 4905.**

United States District Court,
N. D. Illinois, E. D.

July 17, 1980.

John A. Relias, John J. Jacobsen, Jr., Vedder, Price, Kaufman & Kammholz, Chicago, Ill., for plaintiffs.

Ronald Brown, Nelson Hembree, Brown & Shinitzky Chartered, Chicago, Ill., for defendants.

OPINION AND ORDER

SHADUR, District Judge.

Plaintiffs[1] filed a motion for summary judgment against defendants[2] on Count IV of plaintiffs' Complaint. For the reasons stated in this opinion and order, the Court grants plaintiffs' motion and enters summary judgment against defendants as to liability under Count IV of the Complaint. Plaintiffs' right to relief is dealt with subsequently in this opinion.

Jurisdiction in this case is based on diversity of citizenship. Although under conflict of law doctrines the facts might well give rise to the application of substantive law other than that of Illinois, defendants have not disputed the applicability of Illinois law as asserted by plaintiff, and there is no showing in any event that Bahamian law (or any other possibly applicable law) involves any principles different from those under Illinois law. Accordingly the Court will apply Illinois substantive law—after of course determining under federal law whether summary judgment is appropriate.

There are no controverted facts. Plaintiff relies on the facts as stated by Ted Flemming ("Flemming," President of each defendant corporation) in his deposition taken April 24, 1980, and defendants have filed no counter-affidavit. Thus defendants' opposition to the entry of summary judgment is predicated on their argument that the uncontroverted facts give rise to

---

1. Jason Winter's Herbaltea (Bahamas) Ltd., a Bahamian corporation ("Corporation"), and Fred & Sung Co., Ltd., a Canadian corporation, and Won K. Sung, a Canadian resident (collectively "Sung").

2. Flemming Imports Corporation, an Illinois corporation ("Flemming Imports") and Flemming's Herbs, Inc., an Illinois corporation ("Flemming's Herbs"), collectively "defendants." Jason Winter, originally also a defendant, has been dismissed without prejudice.

inferences that themselves create some genuine issue as to a material fact.[3]

### THE UNCONTROVERTED FACTS

Corporation is the owner of a product known as Jason Winter's Herbaltea ("Herbaltea") and the related trademark and goodwill. Herbaltea involves a secret formula, both as to its ingredients and its method of preparation, and is marketed on the basis of a number of health claims. Corporation's shareholders are Jason Winter ("Winter," the "inventor" of the tea and President of Corporation) and Sung.

In 1979 defendants were purchasing Herbaltea on a wholesale basis from Corporation (pages 6 and 18 of the transcript of Flemming's April 24, 1980 deposition, hereafter "FT 6, 18"). At the end of September or the beginning of October 1979 Flemming traveled to the Bahamas to discuss with Winter an arrangement for distribution of Herbaltea (FT 4, 6). In the Bahamas Winter, acting for Corporation, and Flemming, acting for Flemming's Herbs, entered into a written agreement under which Flemming's Herbs would handle all retail orders arising in the North American continent, and all wholesale orders would be forwarded by Flemming's Herbs to "Winters International Market" for distribution. Flemming's Herbs was to pay no royalty or commission to Corporation for the retail orders but was to purchase Herbaltea from Corporation at a rate of $25 per pound (FT 9–11 and Exhibit A). When the agreement was entered into, Flemming "deduced' (as he put it) that Sung had a financial interest in Corporation (FT 50), and Winter so stated to Flemming within a few weeks after the entry into the agreement (FT 48).

Almost immediately after execution of the written agreement Flemming and Winter entered into an oral modification of its terms. Under the 'revised arrangement Flemming's Herbs would not purchase any tea from Corporation but would rather independently purchase the herbs and would mix, bag and label Herbaltea for all Corporation's orders, both retail and wholesale. Flemming's Herbs would pay Winter *personally* a royalty of $5 per bag on all tea sold and no payments of any kind would be made directly to Corporation (FT 14, 21, 24, 56, 57). As Flemming stated at FT 67:

> Flemming: I was requested to pay the royalty to Mr. Winter by Mr. Winter.
>
> Q: Directly to Mr. Winter even though the agreement says to the corporation?
>
> Flemming: He insisted on making checks out in that manner.

In accordance with that modified agreement, Flemming's Herbs began to make and distribute Herbaltea and to make payments covering the $5 per bag royalty to Winter individually, including a payment of approximately $20,000 personally delivered to Winter by Flemming about October 30, 1979, while Flemming was visiting Winter in Canada (FT 27, 28, 34).

While in Canada visiting Winter, Flemming was notified by his office in Schaumburg, Illinois that a letter had been received from an attorney representing Won K. Sung regarding defendants' distribution of Herbaltea. Winter prepared the form of response to that letter, which Flemming allowed Winter to cable to the attorney over the name of Flemming Imports (FT 26–28, Exhibit D).[4]

---

**3.** As recently as July 9, 1980 this Circuit Court of Appeals reaffirmed the established law in this respect in *Central National Life Ins. Co. v. Fidelity and Deposit Co. of Maryland*, 626 F.2d 537, ——:

Equally well settled is the fact that summary judgment under Rule 56, Fed.R.Civ.P., should be granted only where it is perfectly clear that there is no dispute about either the facts of the controversy of the inferences to be drawn from such facts. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). Accordingly, even though there may be

no dispute about the basic facts, still summary judgment will be inappropriate, if the parties disagree on the inferences which may reasonably be drawn from those undisputed facts. *Winters v. Highlands Ins. Co.*, 569 F.2d 297, 299 (5th Cir. 1978); *Exnicious v. United States*, 563 F.2d 418, 423–24 (10th Cir. 1977).

**4.** The cable read: "We have your recent letter regarding Jason Winter's Herbaltea (Bahamas) Ltd. While we were aware of the May 16, 1979 agreement [the agreement by which Herbaltea and related assets were transferred to Corpora-

Flemming also established a checking account entitled "Jason Winter's Herbaltea" and a savings account entitled "Ted Flemming, Trustee for Jason Winter." Each account was maintained at the Suburban National Bank of Woodfield, Illinois, with Flemming as the signatory on each account. Flemming stated regarding the savings account that "when Mr. Winter came to Schaumburg, I thought it would be necessary that he would want a trust account, than what you call signatory?" (FT 60) but that when Winter visited Flemming in October "he did not want to be part of the account" (FT 63). Flemming used both accounts both for the Herbaltea transactions and for his other herbal business (FT 62–67, Exhibits I and J).

Flemming's Herbs continued to make the $5 per bag payments to Winter individually on all sales of Herbaltea until after this suit was filed November 21, 1979. Flemming and Winter thereupon agreed once again to modify the payment arrangements. At the end of November 1979 Winter executed for Corporation and Flemming executed for Flemming's Herbs a new written agreement, backdated to October 30, 1979. That date was selected so that the agreement would pre-date the filing of this suit and its terms would be "included under consideration of the complaint" in this suit (FT 25, 26, 32, Exhibit F). Under the new written agreement *Corporation* was to receive a $3 royalty for every bag of its tea sold by Flemming Imports or Flemming's Herbs. At the same time, though not covered by the written agreement, Flemming agreed on behalf of defendants to pay Winter *personally* $2 for each bag of tea sold. In that respect Flemming testified at his deposition (FT 26, 35):

Q: The contract that was signed October 30th embodied all your previous agreements?

Flemming: No, there are parts left out with payment of complaint, maybe other things.

Q: The money to be paid directly to Mr. Winter was also left out of that contract, was it not?

Flemming: Explain yourself. I don't know what you mean.

Q: Did you pay money directly to Mr. Winter?

Fleming: That's correct.

Q: The October 30th agreement doesn't call for payment directly to Mr. Winter.

Flemming: That is what he asked for.

Q: And you gave it to him?

Flemming: That's correct.

\*　　\*　　\*　　\*　　\*　　\*

Q: Why was the sum then reduced to $3 per bag in the November agreement predated to October 30th?

Flemming: Because Mr. Winter wanted me to pay him $2 outside the contract.

Q: And did you do that?

Flemming: I did that. I made the last payment in February.

Q: You made the last payment in February?

Flemming: Yes, sir, at his demand.

Q: After the lawsuit was still going on?

Flemming: That's correct.

Defendants have in fact made payments to Winter personally under this new arrangement through February 1980. However, no payment has ever been tendered to Corporation under the new written agreement, because of the present lawsuit (FT 33, 35).

### "REASONABLE INFERENCES" AND THE APPLICABLE LAW

Defendants argue that the facts are susceptible of several "interpretations"—essentially that varied inferences can be drawn from the uncontroverted facts—and that those possible interpretations or inferences create a genuine issue as to material facts. But the Court is not obligated to divorce itself from the real world; the inferences

tion; that agreement was signed by both Winter and Won K. Sung on behalf of Corporation] we note that there is a subsequent shareholders agreement in July 1979 [again Winter and Won

K. Sung were signatories] wherein Mr. Winter was given complete and sole responsibility to direct the company affairs. Your intervention is in breach of that contract."

that the cases require be drawn in favor of parties opposing summary judgment are only all "reasonable" inferences (this is the language of the *Central National* case). As our Court of Appeals put it in *Mintz v. Mathers Fund, Inc.*, 463 F.2d 495 (7th Cir. 1972):

> Appellate courts should not look the other way to ignore the existence of the genuine issues of material fact, but neither should they strain to find the existence of such genuine issues where none exist.

And as the Fifth Circuit said in *Doyle v. Bethlehem Steel Corp.*, 504 F.2d 911, 913 (5th Cir. 1974):

> A question of fact is not at issue, however, when reasonable men could not differ on the existence of that fact.

In the Court's view no reasonable inference can be drawn from the pattern of conduct here other than that defendants cooperated with Winter in his diversion of funds properly payable to Corporation. Defendants were dealing with Corporation; each written agreement as well as Flemming's testimony confirmed that. They knew that Winter was not the sole party in interest in Corporation.[5] Nevertheless defendants engaged in a pattern of oral modifications of the original written contract (which had properly been for Corporation's sole economic benefit, not Winter's individually), under-the-table payments to Winter and then the back-dating of a document after this suit was filed—and even the back-dated document was coupled with continued (though smaller) under-the-table payments to Winter personally. Flemming established a bank savings account "as Trustee for Jason Winter" and was unable to explain exactly why he had done so. Only one reasonable inference is possible: Defendants had a direct and cooperative involvement in Winter's financial self-aggrandizement to the detriment and at the expense of Corporation, to which Winter owed fiduciary obligations as a matter of law.

Thus the uncontroverted facts are not tempered or modified by any reasonable inferences to the contrary favoring defendants. Under the circumstances Illinois law, as exemplified by *Zokoych v. Spalding*, 36 Ill.App.3d 654, 670, 344 N.E.2d 805 (1st Dist. 1976), compels the conclusion that defendants are liable to Corporation for having cooperated with Winter in his breach of fiduciary obligations to Corporation.

Accordingly the Court specifically finds "that there is no genuine issue as to any material fact [involved in Count IV] and that [plaintiffs are] entitled to a judgment [as to liability under Count IV] as a matter of law" (Fed.R.Civ.P. 56(c)). In accordance with Fed.R.Civ.P. 56(d), the Court further specifies that the facts stated in the section of this opinion and order captioned "THE UNCONTROVERTED FACTS" exist without substantial controversy.

Plaintiffs are directed to submit on or before August 1, 1980 a proposed form of order embodying appropriate relief under Count IV, together with a supporting memorandum as to the propriety of the relief sought. Defendants are directed to submit an answering memorandum on or before August 15, 1980. Plaintiffs are directed to submit a reply memorandum on or before August 22, 1980. This Court will thereafter consider the memoranda and enter its order granting relief, but the Court defers its rulings as to other relief sought by plaintiffs pending further proceedings in this case.

---

5. That knowledge certainly existed not later than October 30, 1979, when the cable response prepared by Winter for transmission by defendant referred to the shareholders' agreement and the Sung interest. Moreover, Flemming's testimony was that Winter had told him of the Sung interest earlier (FT 8). Indeed, it is likely, though not necessary for this opinion, that defendants knew Winter was not the only party in interest from the very outset, when Flemming "deduced" Sung's financial interest.