**Jose M. ARVAYO, a Minor, By and Through Jose L. ARVAYO and Tina D. Arvayo, Parents and Natural Guardians of Jose M. Arvayo, a Minor, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

No. 82–1611.

United States District Court, D. Kansas.

Feb. 23, 1984.

Mark B. Hutton, Michaud, Cordry, Michaud, Hutton & Hutton, Wichita, Kan., for plaintiffs.

Aileen S. Castellani, Asst. U.S. Atty., Topeka, Kan., for defendant.

## MEMORANDUM AND ORDER

KELLY, District Judge.

This medical malpractice case has now been fully tried before the Court consistent with the procedures under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), § 2671 *et seq.* It is alleged that on January 30, 1979, Jose M. Arvayo, then five months of age, sustained severe physical and mental retardation after he contracted bacterial meningitis, as a result of the negligence of the defendant's employee, Dr. Joseph H. De-Poe, a family practice physician at McConnell Air Force Base. The government has no objection with regard to the venue or propriety of the parties.

It is apparent that the plaintiff is the victim of the ravages of bacterial meningitis, an inflammation of the meninges. The disease is a medical emergency, and delay in its diagnosis or treatment invites neuro-

logical disability or death. While it is not in issue that the plaintiff has suffered significant brain damage, is permanently and totally disabled, and has an IQ of less than 20, some discussion of the disease is necessary. We are dealing here with *hemophilis influenzae* meningitis. For the purpose of this decision, the disease is simply referred to as bacterial meningitis. Bacterial meningitis is amenable to cure only through the timely use of antibiotics, providing, of course, a proper diagnosis is made. Any delay may permit brain damage, causing death or serious sequelae (after effects), including extensive central nervous system damage and mental retardation.

The classic symptoms of meningitis are fever, headache, vomiting, irritability, anorexia (loss of appetite), and drowsiness progressing to lethargy. Infants between three months and two years of age rarely, however, develop the classic picture of meningitis. Most importantly, the highest incidence of meningitis occurs in infants between three months and two years of age. Further, boys are more susceptible to disease than girls, and there is a higher incidence of the disease in the winter than in other seasons. Consequently, standard medical practice requires that any unexplained febrile illness in an infant should make one suspect bacterial meningitis. Further, because symptoms and signs are less predictable in infants between three months and two years of age, standard medical practice indicates the performance of any combination of diagnostic procedures, including blood tests, chest x-rays, urinalysis, and lumbar puncture, when a patient presents any clinical sign or history of unexplained fever.

A definitive diagnosis of spinal meningitis can be made only by examination of the cerebral spinal fluid (lumbar puncture). Early and accurate diagnosis followed by appropriate therapy has a profound effect on the outcome; consequently, it is best to do the puncture which yields a normal cerebral spinal fluid rather than to miss a diagnosis of meningitis. Any unnecessary delay may make the difference between life and death, or between a brain-damaged or a normal individual. A delay in the initiation of therapy or inadequate treatment can profoundly affect the prognosis—it may change drastically from very good to very poor, with the likelihood of death or serious sequelae.

## I. *Liability*

The plaintiffs claim that the government doctor deviated from standard medical practice and breached the duty of care by failing to diagnose the infant's illness as bacterial meningitis and by failing to timely treat the disease. Plaintiffs contend that the untimely delay in the diagnosis and treatment caused the child's brain damage. For reasons stated and found here, the Court concurs.

The government has raised several substantive defenses, each of which shall be addressed in the course of this decision.

First and paramount, it insists that the treating physician, a competent family practitioner on duty at McConnell Air Force Base in Wichita, Kansas, who received the child for care and treatment, exercised requisite care in all respects. In this, based upon his history taken from the mother, his observations, and findings from physical examinations administered by him, his diagnosis and treatment for an upper respiratory infection (URI) was warranted. This diagnosis, an option taken in his clinical judgment, absolves the physician, and thus the government, as a consequence of the disease process (which incidentally fully erupts within 24 hours of this visit).

The government next suggests, however unfortunate, the child's disease, being sudden and wholly unanticipated, literally FULMINATES to fruition. They are, of course, not responsible in such an event.

Next the government contends that in the course of the child's early care, the treating physicians of St. Joseph Hospital, wherein the child was admitted for care on January 31, 1979, the day following Dr. DePoe's examination and diagnosis, negligently treated the child in that they failed to timely engage the lumbar puncture or to

timely treat him with appropriate antibiotics. They further suggest that these physicians negligently occasioned an excess of liquids to be administered in the course of the child's care, which contributed to his cerebral edema and other complications. In this, if the government is in any way at fault, which they deny, they insist an apportionment of fault as relates to the child's ultimate condition and damages must be ascertained under the comparative fault laws of Kansas.

In the course of trial, the government counsel have also urged upon the Court certain statistical data, the substance of which known mortality (10%) or morbidity (30%) in any event is anticipated. The relevancy of any of these statistics escapes the Court, save to remind the practitioner as he receives *any* infant child for treatment and care, certainly under the circumstances found here, that it is of the utmost importance that the practitioner take care to "rule out" the likelihood of bacterial meningitis. The lesson learned in this case is that the treating physician, here or similarly situated, on receiving such a child for history and care, again similarly situated, is to engage a high level or "index" of suspicion, be it in his history (typically from the mother), his own perception and observation, his examination and findings, all in the interest of ruling out this suspicion. This is the standard of care applicable to this case. Indeed, every physician who testified in this case, including Dr. DePoe, seemingly confirm this standard of care which this Court has imposed upon the government. In the course of these proceedings, being in the nature of the physician's approach to a differential diagnosis, it is agreed that only a lumbar puncture establishes with certainty the presence of the bacterial process. Each of the physicians seemingly concur that, if in the course of the physician's examination he "suspects bacterial meningitis and thinks 'tap'—do it!" This axiom is reported only to confirm this Court's appreciation of the necessity of the physicians' understanding of the responsibilities incumbent upon them in the course of an examination of any infant child under the circumstances known in this case.

Returning briefly to the government's reference to certain statistics, it is to note that, given application of the requisite standards by the treating physician, the statistical residuals will be substantially reduced. Beyond this, the data is not persuasive and has been disregarded outright.

Next, the government contends that inasmuch as the plaintiffs failed to timely file their claim, the requisites of the statute of limitations have run, and this case should be dismissed. It appears that the administrative claim per FTCA was mailed by plaintiffs on December 11, 1981, and received by officers at McConnell Air Force Base on December 16, 1981. The Court has previously denied defendant's motion for summary judgment on this issue (Dkt. 18), again took up the government's motion for rehearing, and in the course of that hearing reiterated its findings, overruling the motion as of then awaiting evidence in this case. Now, on hearing the evidence, and hearing none which the Court considers relevant here, the Court again denies defendant's motion with regard to the statute of limitations issue, and in doing so finds that in all respects the plaintiffs' claim was timely filed. A detailed resume of findings and the basis for the Court's conclusions are found in this decision in Section III.

Lastly, the plaintiffs' claim for damages was in the amount of five million dollars. In the course of the discovery process, the plaintiffs amended their claim to the sum of ten million dollars (PTO). The government now complains that plaintiffs are not entitled to amend and are bound by the amount initially claimed. This circumstance was actually brought to the Court's attention at the outset of trial, at which time the issue was reserved pending review of the evidence and receipt of briefs from counsel on the applicable law and/or regulations. In light of the damages assessed in this case, as reviewed and found in Section IV, the issue is moot, and unlike every other issue raised in this most provocative case, is saved for another day!

## II. *Factual History and Resume of Witness Testimony and Findings*

 The mother of the infant plaintiff presented the baby to the military base hospital on January 30, 1979, complaining of a 9-day fever and crankiness. The government physician is perceived by the Court as a well-trained, busy, perhaps too busy, family practitioner who, on January 30, 1979, aside from his other duties (Chief of Hospital Services), received the child per the mother's urgent request of the preceding day for a pediatric appointment. The doctor has no memory of having examined the child or of any of his findings. This is understandable, in part, because the entire process is estimated to have taken between five and ten minutes, and many patients have been seen and treated since 1979. His only record consists of a one-page history sheet, which, in the interest of clarity, is reported in full:

30 Jan 79

CHIEF COMPLAINT: Fever

HISTORY PRESENT ILLNESS: The patient is a five months old boy with fever. His temperature is 100.8°. He has been feverish and cranky for nine days. Appetite is O.K. He has been unable to sleep. He has no cough, and is slightly congested.

PHYSICAL EXAMINATION: Post nasal drainage with slight redness. Tympanic membrances are clear.

LUNGS: Clear

IMPRESSION: Upper respiratory infection.

RX: Triaminic Concentrate 10 qid four times daily.

The physician agreed that an unexplained and prolonged fever, and evidence of irritability, are signs which trigger a suspicion of meningitis. While he insists his clinical history does not suggest such an event, he performed certain neurological tests in the interest of ruling out bacterial meningitis. Unfortunately, his clinical records are wholly silent as to any neurological examination. He insists that a full physical examination followed the history-taking process with the mother, because this process is routine in his practice. The examination will include the following: the physician will palpate the head of the child to ascertain the presence of a fontenal pressure (swelling of the soft spot), a classic sign as regards the onset of bacterial meningitis; he examines the neck, principally to ascertain a sense of tenseness or stiffness—also a classic sign; he otherwise examines the ear for the presence of inflamed membrane; the eyes (extraocular movement); the nose and throat (for presence of drainage, redness or other infectious process); the chest regarding breathing distress (rales); the heart; and the abdomen and genitals, the latter for presence of rash. More importantly, he performs the Kernick test, a leg flex test, and the Bradzinski test (examination of extremities), all in the interest of ruling out bacterial meningitis syndromes. In light of the fact that he has no notes on any of this, he is convinced each of his test results were negative. He testified he does not record negative findings. As a consequence, and while he may have suspicioned bacterial meningitis at the outset, his negative results ruled it out, and in confidence he diagnosed upper respiratory infection, a condition common in children of this age. Inasmuch as the condition was considered viral in nature, he prescribed Triaminic Concentrate.

On the strength of this testimony and record, several noted physicians willingly opted their opinion that the physician's care and/or treatment was within the framework of reasonable medical care, clearly a clinical judgment from which he, and thus the government, should be vindicated.[1] As

---

1. Throughout the course of this case the government's counsel is seemingly impressed and guided by some writings of Dr. Sidney Gillis, editor of *Pediatric News*, an apparent pediatric commentary (Govt.Ex. A). The government has repeatedly reminded the witnesses, certainly all of the government's, and Dr. DePoe, of his concerns: "Our chief worry is the infant who has fever and shows nothing to account for it. Statistically he is most likely to have a viral infection. Are we to get a blood count, blood culture, urinalysis and culture, chest x-ray, lumbar

signaled to counsel during the course of trial, the Court's quandary most likely would settle on confirmation of any relevant physical facts which, one way or another, logically tilt toward the truth, i.e., reasonable probability as relates to the matter. Most assuredly, this Court is not willing to assess an unreasonable burden on Dr. DePoe, or any physician similarly situated. The physician certainly is not the insuror of the child's welfare. If the foregoing resume of Dr. DePoe's testimony is all there is, his clinical judgment, even if wrong, ought to carry the day—but is it? In this, from the outset the Court, as a layman in every respect, is reminded of the horrible consequences of this disease. It must follow that the physician, (not the complaining and unknowing parents) certainly must have an appreciation of the ever threatening circumstances engrained into them through their training and experience. This teaching is to be to such an extent the physician will never forget it nor lose sight of the necessity to rule out its likelihood. However veiled the symptoms may be, the physician is reasonably required to be satisfied, given any signal, that he has indeed explored and exhausted his search.

When Dr. DePoe, the first witness called in this case, left the stand, the Court's quest for what really happened here was under way. By example, Dr. DePoe's testimony revealed that even an upper respiratory infectious process finding is significant. The Court's appreciation of this syndrome, learned in part through the medical literature advanced by the parties, made it apparent that Dr. DePoe's testimony presented at least three essential syndromes deserving of his consideration.

They include prolonged fever, irritability, and upper respiratory infection. Given a complete history, these findings may be denoted from Dr. DePoe's history as set out above. Most assuredly, the Court harbored a view that human nature may have directed Dr. DePoe's testimony. In other words, he may be believing what he desperately wants to believe! Consistent with the Court's natural quandary, it logically followed to further ponder just how sick the child actually was while being examined by Dr. DePoe. In the course of the evidence ultimately presented, the Court is now convinced this child presented signs of his illness far more serious than can be read from the doctor's history. Not only is the medical acceptability of his records in issue, but the *reliability* of Dr. DePoe's testimony and his records become the focus of the case.[2]

These notions were promptly and partially confirmed by Dr. Erlina Pascua, the Base Hospital's pediatrician. This able physician, understandably in a disjointed and reluctant way, commenced to teach the Court much of what is learned and reported here insofar as the disease, its consequences, and requisites with regard to history examination and findings are concerned. Without reservation, geared to a review of the record alone, she would have required a complete blood count (CBC), her interest being with regard to an elevation or shifting of the white blood count. At this juncture, the Court now comes upon something physical but not necessarily then appreciated. In this, it is ascertained that on the day following Dr. DePoe's examination, the existence of a 30,000 white count is reported. This finding is considered to be abnormally high, and which,

puncture on every one of these infants? Obviously not, for we'll end up doing more harm than good." Counsel draws affirmative responses from each of the witnesses. A review of the government's exhibit suggests, however, that she has deleted in her questions the author's additional remarks to the effect that the vanguard here is "the physician should be compulsive in monitoring ...." With all due respect, the Court now interprets this otherwise unidentified critic to be including here the very kinds of things overlooked or missed by Dr. DePoe.

2. The government repeatedly urged through most witnesses that many busy doctors in the course of practice don't keep detailed records. The Court has no problem with this circumstance, as a practice, but not as an excuse. In this regard, this very case suggests the price a busy practitioner may pay for the absence of records.

in the Court's judgment, becomes wholly relevant as to what was actually happening regarding a buildup of the infectious process on January 30. Indeed, this finding corroborates that which was actually present for Dr. DePoe's evaluation. Simply stated, this child was sick, far beyond a "cold," as the mother was so informed.

The plaintiff parents impress the Court as honest and intelligent, as a wholesome young family couple. They were 18 years of age at the time of this event, their son being their first and only child. He was five months of age at this time. They had no experience with prior illnesses of the boy; he had always been happy and healthy since his uncomplicated birth. Over the nine days prior to January 30, 1979, the child had appeared ill to them. They assumed he had a "cold." Indeed, he had felt and acted feverish, and a rectal temperature several days before coming into Dr. DePoe's office was recorded at 104°. The mother wrapped the child in cold towels, bathed him, and administered liquid aspirin. This process seemed to reduce the fever. The mother recalls most the child's irritability and describes him as being sensitive to touch and displaying a "hurt cry." On January 29, she called the base hospital and was given an appointment on January 30.

The mother testified that on January 30, 1979, she told the government physician about the child's history of a 9-day fever and his irritable cry. She testified that the child continued to cry and manifested these reactions in the course of his examination. She testified she told the doctor that the child's cry was a "hurt cry." She recalls being told by the doctor that "kids get cranky when they don't feel good." The doctor did not ask her whether she gave the infant aspirin. She accepted the physician's diagnosis that the child had a cold, filled the prescription, and returned home. She assumed at the time that if he was not better, per the doctor's advice, she would return in a week's time. That night, the child was irritable and cried throughout the night. As indicated, the Court is now convinced the mother's resume with regard to her observations and the child's behavior is reasonably accurate and corroborated. In addition to the white blood count findings on January 31, other significant tests performed gave some signal as to how sick the boy probably was on January 30 in the course of the government physician's examination, and most assuredly what his results would have been had he looked.

The most obvious sign here is the result of a lumbar puncture taken on January 31 at St. Joseph Hospital. This result is reported as purulent, i.e., pus with minimal spinal fluid. This test, of course, fully confirms the onset or existence of bacterial meningitis. As previously noted, it is the expected test, readily engaged by the physician, to confirm the presence of this infectious process. In this case, most physicians, when asked, (including Dr. R.A. Nelson, a well-regarded local pediatrician for the government)[3] concluded that had a lumbar puncture been performed while under the government physician's care, it probably would have suggested a positive finding, i.e., the onset of bacterial meningitis. With such a finding on January 31, they also conclude, and it logically follows, that the child was probably ill on January 30 in a manner consistent with this finding, the child being every bit as sick as the mother reported—probably more so, and the physician missed it! In this case, in the

**3.** The testimony of Drs. Lloyd Olson and Tom Ching for the government is disregarded as wholly partisan. While no one can question their expertise in their respective fields, the Court was surprised as to their ready willingness to vindicate the physician geared solely to his *record.* Moreover, it was when they were pursued in areas of their true expertise, i.e., infectious process, that their reticence became apparent. Simply stated, the Court is not satisfied with those who express ignorance on the very subject of their expertise, principally when relevant facts are at hand and damaging ques-

Court's view, the physician's judgment is not clinical but is actionable negligence.[4]

By the early morning hours of January 31, the child's condition has taken an abrupt change for the worse. His eyes appear to be crossed and the mother describes what are later interpreted to be seizures. Near 11:00 o'clock A.M., the mother frantically called her husband, a fireman at the Base. The family resided approximately 15 minutes driving time to the Base. The husband reached home and returned with his wife and child to the emergency room of McConnell's Base Hospital. They are there received by Dr. Pascua, who, on inspection, was immediately aware that a medical emergency was under way. Initially she noted the child may be cyanotic, grunting, with mottled skin; demonstrating cold, distal extremities, his eyeballs are dry and the pupils are dilated and slow to react. The lungs were full of rales. She suctioned to track mucus; the child was in obvious respiratory distress. She applied oxygen en route to St. Joseph Hospital and arrived with the patient in an Air Force ambulance within approximately 40 minutes from having first received the child. While several physicians amply supported the record as regards their observations and findings, it suffices to say that upon arrival, respiratory distress and elevated heart rate were noted. The child was septicemic; in complete shock; his eyes were fixed. This condition was compounded by continuous seizures now confirmed as grand mal types. In the course of the afternoon, some of the best physicians in this city were consulted. This observation is intended to no way negate the Court's perception of the receiving residents. The specialists included Dr. Dilawer Abbas, admitting neurologic physician, who in turn brings in other consultants, includ-

ing Dr. G.D. Robinson, a most able pediatrician. It is entirely evident that from the outset, i.e., commencing with Dr. Pascua through the resident's reception, early care, the neurologist and the pediatrician, bacterial meningitis was diagnosed. This is simply mentioned here, not only because this condition is the cause of all of the plaintiffs' problems, but because, in retrospect, the defendant's witnesses suggest that at some point in the early course of this plight, the physician should have done the puncture and commenced early introduction, intravenously, of antibiotics.

Insofar as this case is concerned, it is not for this Court to assess the event "idealogically" as seemingly urged by the government and its witnesses. Rather it is to suggest and find that under all the circumstances known, the Court most readily accepts the treating physicians' unanimous explanation; that under all of the circumstances, their clinical judgments were sound; the lumbar puncture and antibiotics were ordered from the outset to be administered as soon as possible. This Court is unwilling to impose any fault as to any of these St. Joseph's Hospital physicians for whatever they did or didn't do in their urgent clinical and/or professional effort to just save the life, and as a consequence finds none.

It would appear that by February 7 a c-scan revealed cerebral edema, a wholly expected syndrome consistent with the disease. In retrospect, however, it is apparently agreed that all of the liquids by then fed to the child probably exceeded the norm. Some suggested that under the circumstances the nature of treatment required this event, i.e., a medical necessity under the circumstances. Others, includ-

---

tions are put to them. In every event, they are no help here.

**4.** There is an additional finding which, if taken even routinely, probably would have signaled early signs of distress, i.e., dehydration by way of urinalysis. The mother disputes the physician's suggestion of the boy's ready appetite, which the Court is convinced simply was not the case. On January 31, the urinalysis report is described as "dark brown," a warning sign of

dehydration. Most physicians, when asked, agree that a similar result probably would have been revealed if taken on January 30. Certainly, if for no other reason than perhaps the physician was too busy, this simple test might have triggered his curiosity. There is no question in this Court's view that if taken, at least one positive finding would have been noted on his records.

ing Dr. Robinson, offered that the suggestion is unfair inasmuch as it does not take into account the state of the child's dehydration. Most assuredly, the treating physicians, including Dr. Robinson, pediatrician in charge of the patient's care, vehemently denied a medical omission. The circumstances here are best described by Dr. Butler, then a family practice resident and treating physician under Dr. Abbas, both of whom the Court was much impressed with and persuaded. He simply and logically concludes: "His blood pressure was going!—He was on the verge of dying!" To this plight, the Court concurs and further finds no fault here with regard to any of the physicians' care or treatment following the time last seen by Dr. DePoe. Neither has the physicians' care remotely contributed to the child's edema or its complications, if any. In this regard, the infectious course of the ravages of this disease logically includes this pathology, and the Court concludes that the edema is an expected complication.

On February 19, hydrocephalus is diagnosed. This condition, a consequence of swelling and resulted blockage of ventricular fluid of the brain, is again a consequence of the infectious process, i.e., a complication of bacterial meningitis. Again, the government suggests that this sequela is contributed to by reason of omissions in the physicians' care. Again, this Court having found none, certainly under the circumstances of this case, rejects defendant's thesis and tendered opinions. It is here the Court's finding that this unfortunate development, which in turn engaged additional neurological surgery, i.e., shunt implant, is as a consequence of and a complication of the disease process.[5]

By way of additional explanatory comment, certainly as this Court views the evidence, the opinions and expertise of the treating physicians are accepted here as sound, certainly as opposed to other opinions tendered. The Court is reasonably convinced that the judgment of those who were there, who witnessed and experienced firsthand this event—all that is important and not important—in the management of this (or any case for that matter), who most assuredly have that "professional" feel for the patient in his circumstances, are far more likely to be correct as to the recollections of the event, basis for findings and opinions, than an academician or other practitioner, perhaps of equal stature, perhaps far more in his field, who, in hindsight, solely on the basis of a record, without the courtesy of conference with those involved, who has never seen the child, and who concludes differently, adversely or critically. In every way, this Court, fully aware of its responsibilities as the factfinder, and of the gravity of these findings, is entirely comfortable with having rejected the tendered defendant witness testimony and fully adopting plaintiffs' evidence and witnesses, principally in the areas noted.

Lastly, some findings and comment with regard to the significance of the timely administration of antibiotics, if given on January 30. The hospital records suggest the nature and quantum of these antibiotics, with which we deal. In response to the ultimate question, the same wave of physicians noted above have testified that had the child been given similar quantums of antibody therapy on January 30, as given on January 31, it is medically probable, i.e., more likely than not, that the child would be free from the severe disabling injuries he now suffers. In fairness, no one here suggests a complete cure, i.e., no residuals. This expectancy now will never be known. All that is known now, and found here, is that Dr. DePoe failed to reasonably and timely diagnose the child's condition, and thereafter to timely treat him, all of which gives rise to the child's present condition.

More specifically, and consistent with the ultimate finding here, the Court finds that the child's present condition is as a conse-

---

**5.** Peripherally, the government also suggests some fault at the hands of the hospital and physicians for failure to implant a cerebral fluid monitor. This rather new development was not contemplated nor was it available at St. Joseph Hospital in 1979. This contention is without merit.

quence of the negligence of the examining physician, i.e., Dr. DePoe, in his failure to exercise requisite care in his treatment and care of the child. Specifically, his history was inadequate under the circumstances presented. There were indeed sufficient and significant signs available to reasonably require the "ruling out" of the presence of the infectious process. The physician failed completely in this regard, and such failure is wholly actionable here.

Consistent with these findings, the Court verily rejects the government's contention that the bacterial meningitis process literally "fulminated" as medical nonsense.

### III. *Statute of Limitations*

The government alternatively contends that despite whatever findings of liability are made, the Arvayo claim is barred by the statute of limitations provision of the FTCA that requires a claimant to file a claim with the "appropriate federal agency within two years after such claim accrues." 28 U.S.C. § 2401(b). The government relies upon the rule of *United States v. Kubrick*, 444 U.S. 111, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979), which states that a claim "accrues" within the meaning of the FTCA when the claimant has knowledge of the existence of his injury and knowledge of the cause of his injury. The government argues that the child's injury is mental retardation and that the Arvayos knew of the existence of the injury possibly as early as March 1979, when the parents observed the developmental delay in their child, but that the parents definitely knew of the developmental impairment in August 1979, when the child underwent medical evaluation at St. Joseph's Hospital. The government contends that the cause of the injury was bacterial meningitis and that the parents knew this at the time of hospitalization on January 31, 1979. The government argues that the claim therefore accrued in August 1979, when the Arvayos knew of both the injury and the cause, and that they were required to file their claim by August 1981. Their December 16, 1981, filing date would therefore be untimely and

the Arvayo tort claim against the government would be forever barred.

The plaintiffs, on the other hand, argue that the claim is timely. The plaintiffs, too, rely on the *Kubrick* rule that a claim accrues when a claimant has knowledge of the existence of and the cause of the injury. The plaintiffs maintain that the government's contention that the cause of the child's injury was bacterial meningitis is overly simplistic. The plaintiffs argue that the cause of the injury was not merely the disease but, rather, the cause was the act or omission of the government doctor by his failure to correctly diagnose the disease and his failure to properly treat the disease. Plaintiffs offered evidence that the peculiar characteristics of meningitis required prompt detection and immediate treatment with antibiotics. Plaintiffs contend that this delay in the diagnosis and treatment of the disease more accurately defines the cause of the retardation rather than identifying the cause of injury as bacterial meningitis. The Arvayos did not learn until August 1981 about the causal relationship between a delay in the diagnosis of meningitis and the increased risk of severe developmental defects. In August 1981, the Arvayos consulted an attorney because of their dissatisfaction with the government insurance coverage of the child's medical expenses. It happened that the attorney was with a well-renowned medical malpractice firm that had experience with delayed diagnosis in meningitis. The attorney informed the Arvayos of the probable connection between delayed diagnosis and mental retardation, and following investigation this suit was subsequently filed. Plaintiffs contend that it was not until August 1981 that they knew the cause of the injury, and the December 16, 1981, filing was well within the limitations provision.

The question here is how to identify the critical facts concerning causation in failure to act cases. The issue is whether a claimant's knowledge of the existence of the medical condition or disease is knowledge of critical facts sufficient to put a reasonably diligent claimant on notice of

his possible claim, or whether a claimant need also know about the act or omission of the defendant that caused the injury, and the causal relationship between defendant's act and the injury.

The Supreme Court addressed the issue of when a medical malpractice claim "accrues" within the meaning of the FTCA in *United States v. Kubrick*, 444 U.S. 111, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979). The Court framed the issue as "whether the claim 'accrues' within the meaning of the Act when the plaintiff knows both the existence and the cause of his injury or at a later time when he also knows that the act inflicting the injury may constitute medical malpractice." *Id.* at 113, 100 S.Ct. at 355. In *Kubrick*, the plaintiff argued that the claim accrued when the plaintiff had knowledge that his legal rights had been violated (when a doctor told him that the drug should not have been administered and that the treatment was improper). The government, on the other hand, argued that the claim accrued when the plaintiff had knowledge of the existence of his injury (hearing loss) and the cause of the injury (administration of the drug, neomycin).

The Court emphasized the distinction between a claimant's knowledge of a violation of his *legal rights* and his knowledge of the *facts* of his injury and its cause. The Court stated, "We thus cannot hold that Congress intended that 'accrual' of a claim must await awareness by the plaintiff that the injury was negligently inflicted." *Id.* at 123, 100 S.Ct. at 360. In effect, the Court held that a claim accrues when a claimant has knowledge of the existence of his injury and the cause of his injury. The Court did not agree that the statute begins to run only when a claimant had knowledge of the existence of a legal claim against the government.

The predominant tenor of the *Kubrick* court was the distinction between a litigant's awareness of his rights or that he had been wronged, and the litigant's knowledge of the isolated facts that give rise to the claim. The Court distinguished the *Kubrick* facts from the facts of two other

leading cases construing the meaning of "accrues," *Urie v. Thompson*, 337 U.S. 163, 69 S.Ct. 1018, 93 L.Ed. 1282 (1949), and *Quinton v. United States*, 304 F.2d 234 (5th Cir.1962). The Court stated, "[N]either [*Urie* nor *Quinton*] controls this [case]. Both dealt with the *discovery of the factual predicate for a malpractice claim*, but neither addressed the question of plaintiff's awareness of negligence on defendant's part." *Id.* 444 U.S. at 121 n. 8, 100 S.Ct. at 359 n. 8 (emphasis added). *Urie* dealt with plaintiff's knowledge of the existence of his injury, and *Quinton* dealt with the plaintiff's knowledge of both the existence of her injury and its cause. Neither case involved plaintiff's knowledge of the existence of a possible malpractice action against the government.

The *Kubrick* facts show that he was keenly aware of the existence of his injury and the cause of the injury, although he did not know that the government physician's administration of neomycin was improper conduct. Kubrick filed two claims and one appeal with the Veterans Administration, expressly alleging that the *neomycin treatment caused his deafness*. *Kubrick, supra*, 444 U.S. at 114, 100 S.Ct. at 355. Clearly, Kubrick knew of the existence of the injury and its cause.

The Court emphasized Kubrick's knowledge of the facts that his hearing loss existed and that it was caused by neomycin as contrasted with his lack of knowledge that the physician's treatment was wrongful, negligent, or in violation of his rights. The Court said that knowledge of the injury and its cause was the "factual predicate" of Kubrick's claim. *Id.* at 118, 100 S.Ct. at 357. The Court noted that Kubrick was aware of the "essential facts" of his claim, *id.* at 121, 100 S.Ct. at 359, and that he was "in possession of all the facts about the cause of his injury." *Id.* at 123, 100 S.Ct. at 360. The Court found that a prospective claimant had sufficient notice of a possible claim when he was "in possession of the critical facts that he [had] been hurt and who [had] inflicted the injury," *id.* at 122, 100 S.Ct. at 359, and when a plaintiff

had knowledge of the "relevant facts about injury." *Id.* at 124, 100 S.Ct. at 360. The Court reasoned, "A plaintiff such as Kubrick, armed with the facts about the harm done to him, can protect himself by seeking advice in the medical and legal community." *Id.* at 123, 100 S.Ct. at 360. In sum, a fine restatement of the *Kubrick* test is "whether a 'reasonably diligent' claimant knows enough so that he 'can protect himself by seeking advice in the medical and legal community.'" *Lee v. United States,* 485 F.Supp. 883, 886 (E.D.N.Y.1980).

Numerous cases have been decided in light of *Kubrick.* Most relevant to the case at bar are cases addressing the issue of when a claimant has knowledge of the *cause* of an injury in cases involving acts of omission, such as failure to diagnose, failure to treat, or failure to warn. The determination of what are the facts of causation is sometimes difficult, especially in failure to act cases. In *Kubrick,* Justice White observed that "the facts about causation may be in the control of the putative defendant, unavailable to the plaintiff or at least very difficult to obtain." *Kubrick,* 444 U.S. at 122, 100 S.Ct. at 359. The instant case involves the government doctor's failure to diagnose and his failure to properly treat the disease. *Kubrick,* on the other hand, involved the doctor's administration of an inappropriate drug—an act of commission. In omission cases, facts about causation are often elusive. A potential claimant often is aware of his injury and its cause in the sense of its medical origin, such as a medical condition, disease, or drug treatment. Although a claimant may know that the medical condition is the source of the injury, he may be ignorant of the acts or conduct of intermediaries who exacerbate or fail to cure or arrest the disease process. In omission cases, these secondary facts about the cause of an injury are often the critical, essential, and relevant facts required to establish the "factual predicate" of a claim. As the Ninth Circuit stated, "The holdings in *Kubrick* [and another commission case] are instructive but cannot be applied mechanically to cases involving the failure to diagnose, treat, or warn." *Augustine v. United States,* 704 F.2d 1074, 1078 (9th Cir.1983).

*Waits v. United States,* 611 F.2d 550 (5th Cir.1980, is an omission case analyzing the "cause" of the injury. In *Waits,* the VA hospital personnel improperly treated plaintiff's infected, fractured leg with an antibiotic and the leg was later amputated. Waits knew he had an infection and that he was treated with antibiotics (two facts relating to the cause or the medical source of his injury), and he knew his leg was amputated (the injury). Thus, one might argue that he knew the essential facts about his injury and its cause. Waits, however, did not know that the culture and sensitivity tests were not properly reported or acted upon, or that the antibiotic treatment was improper. Waits, therefore, had knowledge of the isolated facts of cause (infection) and injury (computation), but he had no knowledge about the acts, conduct, or omissions of any intermediary that caused the final injury.

Likewise, the Arvayo parents knew the fact of the injury and the bare fact of the medical source of the injury, but they were ignorant of the act, or rather, the omission of the military doctor that resulted in the severe retardation of their child.

The Fifth Circuit recognized the need to apply something other than a mechanical test of knowledge of bare facts of injury and cause in omission cases. The Court, acknowledging the *Kubrick* rule, said, "The question of what knowledge should put a claimant on notice of the existence of a viable claim is not soluble by any precise formula.... It is not enough to trigger the statute of limitations that the claimant is aware of his injury if he is unaware of the act or omission which caused the injury." *Id.* at 552. The Ninth Circuit held that the *Waits* claim did not accrue until he knew of the hospital personnel's failure to properly record and act on laboratory tests and their improper administration of the antibiotic.

The Ninth Circuit's analysis of the critical facts required in an omission case supports the plaintiffs' argument that the Arvayo claim did not accrue until they were aware that the government physician's misdiagnosis caused the severe injury. They knew the bare, isolated facts of the injury (retardation) and the medical source or cause (bacterial meningitis), but they did not know about the critical fact that a delay in diagnosis and treatment of meningitis causes severe retardation.

This Court notes that the *Waits* court considered the failure of the hospital to promptly produce the medical records in its holding that the statute was tolled. The critical point, however, is that *Waits* was not a concealment case and the holding did not turn on this issue. The Court used the concealment issue to underscore its holding. The rule in *Waits* is that in an omission case, a mechanical formula consisting of the isolated facts or circumstances of cause and injury is not sufficient; omission cases accrue when a claimant knows of the specific acts or omissions causing the injury.

*Lee v. United States*, 485 F.Supp. 883 (E.D.N.Y.1980), was another omission case that explained that the "cause" of an injury is not merely the isolated fact of the medical condition giving rise to the injury, but the "cause" is the act or omission of an intermediary that promotes or fails to arrest or cure the medical condition. In *Lee*, an infant was brain damaged when a military doctor mismanaged the birth of the infant. Again, the parents knew the fact of the medical source of the injury (fluid in the lungs resulting in decreased oxygen to the brain) and of the injury (brain damage and mental retardation). However, the parents were ignorant of the government doctor's acts that caused the infant's injuries (mismanagement of the infant's delivery). The parents had no reason to suspect any type of medical malpractice, and at no time did any government or civilian doctor insinuate that the government doctor's mismanagement of the delivery contributed to the infant's retardation. The government in *Lee*, similar to the government in the instant case, argued that the plaintiff knew the cause of the injury—fluid in the infant's lungs—and that the claim accrued before the parents learned that this condition was caused by the military doctor's acts and omissions.

The Court reasoned that the term "cause," in the context of the *Kubrick* test, is not simply the medical condition that gives rise to the injury, but rather, is the act or omission of the defendant that causes or exacerbates the injury. The Court stated:

> The Supreme Court plainly did not mean by the "cause" of the injury to Kubrick to refer to the action of the neomycin on the cells of the body. The Court referred rather to the administration of the drug by the hospital personnel. As the Court indicated, to know the "cause" the plaintiff must know who has inflicted the injury. (Citations omitted). In an action for medical negligence the "cause" which is at issue is the act of the defendant which gave rise to the injury.

*Id.* at 887.

Also relevant to the case at bar is the Court's consideration of the parents' unsuspicious reliance and trust of the expertise of the medical profession:

> ... The patients may not know that they have been injured, or, if they do, they may not know that acts of their doctors have contributed to the injury. The doctor will hardly be inclined to proffer information which may lead to action against him, and, relying on his vastly superior knowledge and experience, the patient may be slow to learn the critical facts.

In *Jackson v. United States*, 526 F.Supp. 1149 (E.D.Ark.1981), *aff'd* 696 F.2d 999 (8th Cir.1982), the plaintiff underwent surgery and subsequently sustained a stroke and cardiac arrest due to the negligence of VA hospital personnel. The plaintiff knew of the medical origin of his injury (stroke and cardiac arrest) and of the existence of the injury (massive brain damage resulting in a severe personality disorder). However, he

had no knowledge of the acts and omissions of the hospital staff that caused the stroke and cardiac arrest.

The district court concluded, and the Eighth Circuit affirmed, that the plaintiff was for some time unaware of the acts or omissions of the hospital personnel that caused the stroke, and that he could not have reasonably discovered the stroke was caused by the staff's negligence. The Court held that knowledge of the occurrence of a stroke or cardiac arrest (medical origin) was not the equivalent of knowledge of the critical facts concerning causation. Also noteworthy is the Court's conclusion that a medical negligence claim does not accrue when a reasonably diligent claimant relies upon a medical explanation that fails to disclose the critical facts concerning the cause of the injury.

In *Harrison v. United States*, 708 F.2d 1023 (5th Cir.1983), the Fifth Circuit considered what facts constitute facts of causation. Although the facts are replete with concealment of medical records by the defendant, the Court decided the case on the issue of what constituted the facts about "cause," not on the issue of concealment. *Id.* at 1028 n. 1. This was not a failure to act case, but rather, involved the doctor's performance of a test on plaintiff whereby a needle was lodged in her brain and caused injury. Relevant to the instant case is the Court's observation that critical facts involving causation are sometimes knowledge of facts of the causal relationship and this knowledge is not necessarily equated to knowledge of fault in the legal sense, i.e., negligence. The Court stated:

> The plaintiff need not have knowledge of fault in the legal sense for the statute to begin to run, but she must have knowledge of facts that would lead a reasonable person (a) to conclude that there was a causal connection between the treatment and injury or (b) to seek professional advice, and then, with that advice, to conclude that there was a causal connection between the treatment and injury.

*Id.* at 1027.

The Tenth Circuit followed the *Kubrick* rule in three cases in which the Court considered whether the plaintiffs had sufficient knowledge about the facts of their claim so that their claims had accrued. *Gustavson v. United States*, 655 F.2d 1034 (10th Cir.1981); *Robbins v. United States*, 624 F.2d 971 (10th Cir.1980); and *Hatch v. United States*, unpublished op. no. 80–1195 (10th Cir., Aug. 10, 1981) (per curiam). These cases, however, are different from the instant case. None of these cases are omission cases and involve either knowledge of the injury or knowledge of legal rights.

*Gustavson, supra,* and *Robbins, supra,* turned on the issue of knowledge of the existence of the injury. These two cases are factually different than the case at bar because the plaintiffs in these two cases had knowledge of their injuries and the statute ran; whereas, in the case at bar, the plaintiffs did not have knowledge of all the facts concerning the cause of the injury. In the two former cases, the Tenth Circuit held that a claimant has knowledge of his injury when he knows the general nature of the injury; the lack of knowledge of the precise nature of the injury, such as its permanence, extent, or ramifications, does not toll the statute. In *Gustavson*, the Court held the statute began to run when the plaintiff learned that he had severe kidney damage, although he did not know at that time that the injury was irreversible, permanent, would require dialysis, and would eventually lead to his death.

The clear test here seems to be that once the patient is armed with the knowledge of his injury and its cause, the burden is upon him to ascertain in what instance his condition should have been recognized. What is of interest here is that Judge Logan assessed 1973, being the time of the patient's conference with the physicians who apprised him that his surgery could have been done years before, as the time when the claim accrues. In other words, consistent with *Kubrick, supra,* the patient was then in possession of the critical facts as to the nature of his injury, who inflicted it, and why it was caused.

In *Robbins,* the Court similarly held that the plaintiff's knowledge of marks on his skin constituted knowledge of injury and that the statute commenced running with this knowledge; the statute was not tolled until plaintiff learned that the marks were permanent. The *Robbins* court, following *Kubrick,* emphasized that a claim accrues with knowledge of an injury and that accrual is not postponed until "claimant has knowledge that the acts causing injury might constitute medical malpractice." *Id.* at 972. The Court stated, "[K]nowledge of a legal duty owed him or a breach of that duty is irrelevant."

A third Tenth Circuit case following *Kubrick* is *Hatch v. United States,* unpublished op. no. 80-1195 (10th Cir., Aug. 10, 1981) (per curiam). In this case, too, the claim accrued because the plaintiff had knowledge of his injury (deafness and crippling of right foot and leg) and knowledge of the probable cause (administration of the drug, streptomycin). The Court, consistent with *Kubrick,* rejected plaintiff's contention that the statute was tolled until plaintiff had knowledge of enforceable legal rights against the United States, that is, until they learned that the United States was potentially liable.

The government has relied in great measure on the reasoning of the trial judge in *Camire v. United States,* 489 F.Supp. 998 (N.D.N.Y.1980), most assuredly the single case which has given this Court the most difficulty as *Kubrick* is analyzed. The facts in *Camire* are factually similar to the case at bar in that the alleged negligence consisted of the misdiagnosis of and failure to treat meningitis. The government physician diagnosed the illness at the outset as a cold and treated it as a cold from April 15 through April 17, 1971. The child was thereafter referred to a specialist for treatment on April 27, 1971, at which time the appropriate diagnosis of meningitis was made and he received appropriate care. The case was remanded for trial on the sole issue as to when a reasonable person in the position of the child's mother should have realized that negligent malpractice occurred, i.e., when did the plain-

tiff's claim accrue? Decision on that case was delayed awaiting a ruling in *Kubrick.* Factually, it appears that the mother acknowledged it to be very possible that the physicians who saw her on April 27 advised her that her child had been through the advanced stages of meningitis for three or four weeks previous. In April 1972, the child was evaluated by Dr. Davis, a civilian specialist, who apparently advised her that the child's abnormal conditions were the result of the failure to initially diagnose properly the meningitis with its resultant delay in receiving appropriate treatment. She visited with an attorney in July 1973, and filed her claim in January 1974. The trial court reasoned that it is impossible to extend the period of triggering of the statute of limitations to a point beyond the fall of 1971, when the plaintiff's parents were in possession of knowledge that the child was (1) suffering from a severe sight and hearing loss and a brain injury, (2) had not developed as a normal child, and (3) at almost one year of age was acting as a newborn infant just home from the hospital. He further reasoned that to delay the commencement of the statute at least until such time as the plaintiffs were apprised with regard to the cause of this condition by Dr. Davis would eviscerate the statute.

In sum, the *Camire* court concluded that this was not a case of a hidden condition or one of great complexity. He reasoned that if the condition of the child resulted from misdiagnosis, improper treatment and delay in proper treatment, the causation announced itself to the parents clearly and loudly not later than the fall of 1971.

This Court has always been convinced that the plaintiffs' claim accrued only when the parents ascertained that the child's condition was caused by a delay in diagnosis and treatment. This Court took the government's motion to dismiss under advisement pending a showing of evidence at the trial that the parents may have learned of this causal connection either in communications with doctors or otherwise prior to the plaintiffs' conference with an attorney. Other than this, this Court has not been

willing to acquiesce in the *Camire* court's suggestion that the significance of a delayed diagnosis is of little complexity. Judge Port seems to assume out of hand that everyone would understand and appreciate the delay as part and parcel with cause and effect. In the final analysis, this Court, now having heard the evidence, most respectfully disagrees with his colleague.

Now, returning to this case, the evidence is apparent that from the outset, i.e., January 31, 1979, the parents have reason to know that this child is inflicted with bacterial meningitis. In the early course of time they come to appreciate the effects of the disease process, i.e., brain damage with acute retardation (the injury). Now, according to the government's contention, they then have the knowledge of the nature of its cause and its injury. Unlike most cases, surely none of those discussed or considered by Justice White in *Kubrick, supra,* nor any of those entertained by this circuit, the parents in this case did not have the slightest notion as to the critical facts which gave rise to the severe damage to their child. None of the treating physicians were aware of the delay, a review of Exhibit 1 would reveal nothing, and surely, even if contemplated, however remote, Dr. DePoe wasn't likely to volunteer it. In other words, through the course of the requisite time frame, these innocent plaintiffs, indeed the treating physicians, wouldn't know the right questions! It was for this reason that the Court overruled the government's pretrial motion and awaited clarification of the evidence.

In the course of this trial, the Court became convinced that the plaintiffs were never timely apprised of any reason to suspicion the significance of the event with Dr. DePoe on January 30, 1979, until the mother visited an attorney in the summer of 1981. The government's unsuccessful effort to confirm such suspicions in cross-examination of the plaintiff mother and her physicians, including Dr. Robinson, is noted. To appreciate what has actually occurred here, and what actually gave rise to the delay, it is best to hear the plaintiff mother's explanation. In this, it is best to recall the Court's description of this family, i.e., honest and intelligent. Also, they are quite young, wholly trusting of authority, particularly medical persons. Early reasons to suspicion fault at the hands of Dr. DePoe are completely out of the question. It should further be noticed that they have from time to time conferred with Dr. Robinson and others, each extremely well-qualified in the field of pediatrics and neurology. No one has suggested any relationship between the child's plight and a delay in diagnosis. It is doubtful if any of the treating physicians had even heard of Dr. DePoe, the extent of his care and treatment; and most assuredly, no one had volunteered a relationship. In other words, this Court is comfortable in finding that within the 2-year time frame the plaintiffs never were timely advised nor had reason to inquire as to the significance of delay in the diagnosis of the child's care and treatment at the hands of Dr. DePoe.

Now it develops that the plaintiffs have in some wise taken issue with the military medical carrier, i.e., Champus, regarding the payment of certain bills incurred in behalf of the child. In August 1981, the plaintiff mother elects to seek counsel with regard to this problem. She was then employed by an insurance agency whose office was adjacent to that of her present counsel. Unbeknownst to her, a most fortuitous event occurs. Her lawyer and his firm are probably the most reputable and knowledgeable lawyers in the field of medical malpractice cases in this or most vicinities. Indeed, they have had some experience in dealing with delayed diagnosis cases. Doubtless the history from the plaintiffs' circumstances triggered their counsel's curiosity, and with her approval he commenced an investigation seeking out the necessary records and other evidence. Following the lawyer's investigation and review, he then filed a claim for damages. In this Court's view, the plaintiffs' process and the handling of the matter by their attorney has been wholly done in a reasonable and responsible way, the claim filed

only when the attorneys had at hand a reasonable basis to support the claim, and *not* before.

In the case at bar, this Court finds that the cause of Jose Arvayo's severe mental and physical retardation was not merely his contraction of the disease of bacterial meningitis, but more accurately, the cause of his mental and physical retardation was the government doctor's failure to diagnose the illness as bacterial meningitis, and his failure to properly and timely treat the disease. The Court finds that the government's contention that the cause of Jose Arvayo's severe brain damage was the disease alone absolutely oversimplifies the matter. The act or omission of the doctor caused the injury. The sheer circumstance of contracting the illness alone was not the cause. Analogizing the *Kubrick* facts, it was not the drug alone that caused Kubrick's injury, but it was the doctor's act of administering the drug that caused the injury. The basis of this finding in the case at bar is that the delay in the administration of antibiotics caused the severe injury. The Court finds that the fact that the delay caused the injury is a "critical, essential, and relevant fact" regarding the claim. The Arvayos' knowledge of the fact that the delay caused the injury, in conjunction with their knowledge of the existence of the injury, constitutes the "factual predicate" of their claim. The Court specifically notes that this case does not turn on the Arvayos' discovery that a legal duty owed to them was breached. The Court emphasizes that although the time that the Arvayos discovered that the delay caused the injury was also the time that they became aware of a probable violation of their child's legal rights, the basis of the Court's finding is the Arvayos' discovery of the fact that the delay caused the injury and not the Arvayos' discovery of a violation of their rights.

■ A claim does not "accrue" within the meaning of the FTCA until a prospective claimant has knowledge of the factual predicate of his claim, i.e., the fact or the existence of an injury and the fact of the cause. Further, knowledge of "cause" in failure to act, or omission, cases is not merely knowledge of the medical condition or disease that causes the injury, but knowledge of the "cause" includes knowledge of the acts or omissions of the defendant that causes, exacerbates, or fails to treat the medical condition. Some knowledge of the causal relationship between the defendant's failure to act and the injury may be necessary if a reasonably diligent claimant has no reason to suspect or question the acts of the medical practitioner.

■ Accordingly, the Court finds that the Arvayo claim did not accrue until August 1981, when the Arvayo parents learned that the delay in the diagnosis and treatment of bacterial meningitis was most likely the probable cause of their child's severe retardation. Consequently, the December 16, 1981, filing of the administrative claim was timely and not barred by the limitations provision of the FTCA.

### IV. *Plaintiffs' Injuries and Damages*

■ This child is now five years of age. He resides with his parents in Mesa, Arizona, and attends a special education facility on a daily basis for the handicapped and retarded. The Court has carefully reviewed all the evidence here; this includes the video tape by Dr. Doris Greenburg, one of this case's most impressive witnesses. Dr. Greenburg's field is in the area of behavioral pediatrics, i.e., developmental disabilities and child development. In addition, the deposition of Dr. Albert Siegel, a well-regarded specialist in the field of rehabilitative medicine, has been studied. In addition, the Court has considered the follow-up care by Dr. Abbas and Dr. Robinson, reports of the Institute of Logopedics and the Rainbow Center of Wichita, the latter facilities having fully tested and evaluated the child, and other exhibits including Plaintiffs' Exhibit No. 13 which is the letter report of Dr. Arthur Prensky. In addition, the Court observed the child at a point in trial. It appears obvious the child is profoundly retarded. As regards his circumstances and needs, the Court draws

upon the collective resumes from the testimony of Drs. Greenburg and Siegel, principally in the interest of perspective and for the findings.

As a layman perceives it, the child carries an intellectual quotient of 20. Dr. Greenburg's testimony and reports suggest that his developmental quotient is less than 20, i.e., at an early five years of age he is functioning at best at slightly less than a one-year-old level in his adaptive behavior. By example, he can place two cubes in a cup, uncover a toy which is covered by a paper, match two cubes, poke at a clapper of a bell, grasp the bell by the handle, wave the bell, and pull the ring by the string and dangle it—a pitiful circumstance. Considering gross motor limitations, he has a left hemiparesis. In this, he can stand momentarily, cruise around the furniture, and walk with one hand held. He crawls to get from one place to another; continuing from a fine motor standpoint, he engages a crude use of his left hand, using it more like a prop or paw than a hand with finger control. Regarding language, the child vocalizes "Dada" without meaning, understands "no" and the tone of voice. He makes a razz sound observed as well as the child was presented in the courtroom. His personal or social progress is obviously limited. In this regard, he can feed himself with a spoon and cup. He will catch objects in play; he continues in diapers.

As these devastating neurologic syndromes are considered and projected, again, in the interest of perspective, it is established that his intelligence is approximately ⅕ the intelligence of his age. By example, at age 16 he could be expected to talk as a three-year-old. Unfortunately, he will also be aware that he is different. Momentarily, of course, he can't talk at all. Most assuredly he will always require continued medications for the seizures and routine examinations, principally neurological, with regard to the shunt implant. He will also need braces and/or splints in light of his unsteady gait. He will require assistance in the areas of many therapies. As Dr. Siegel points out, he must see a physician repeatedly simply to keep the parts functioning. This by example also includes attendance by a urologist and neurologist. It is urged, and the Court concurs, that as of this moment the child should have the benefit of nursing care on a daily basis. The child, indeed, requires occupational therapy which has as its goal an increased ability to assist the child in such things as dressing, feeding and toileting, if possible. He requires a speech and language therapist, initially in an evaluation of the youngster's ability to articulate, make sounds and understand language. As the youngster reaches certain plateaus, a training program to develop more sounds, better articulation, and understanding more language is in order. It is recommended, and the Court concurs, that a teaching assistant, on stream now in his behalf, is in order. As for whatever is to come with regard to this child, it is clear that the thought of any form of self-sufficiency is impossible. His condition is permanent and wholly disabling.

This young family momentarily handles the child's needs, obviously in the absence of funds. Their jobs are such that he is a fireman and works at night, and she is a medical assistant who works through the day. They have deliberately programmed their employment so that she may see the child off to his present school and the husband is at home to receive him. They are understandably hopeful to keep the child at their home and with them as long as they are able. For reasons indicated, it is, in the Court's view, doubtful if such a situation can long exist. It is entirely reasonable to have available now continuous additional care, as above referred and which is included in the assessment of damages. The Court should note, however, that as it relates to such provisions as a teaching assistant or nursing care, such persons' availability on a continuous and dependable basis is doubtful. Most persons logically and understandably avoid such frustrations.

While, as indicated, the Court appreciates the parents' wishes with regard to institutionalization, the Court also concurs with Dr. Siegel's experienced advice that in time

the parents normally wear down, and even with assistance the child is destined for institutionalization at least by age 19, if not before. This finding is additionally made inasmuch as projections of damages are geared to this time frame. Institutional needs here are different from the norm. In this, the child simply is not able to function in most, if it includes the requisites to make a bed, walk to a commercial dining facility, attend to normal toilet needs. It will include a place given 24 hours a day, seven days a week confinement, 365 per days a year—round the clock supervision. Given credence to an otherwise normal life expectancy, adopted here, as 66.7 years—at least 48+ years! Comparative studies for this purpose as provided by the witnesses suggest a reason to ascertain a need and expenditure in the aggregate of $3,000.00 per month.

It is noted that as of this date the aggregate sum of $45,000.00 has already been expended for hospitalization, other institutions, physicians, and medical care. These expenditures have been reimbursed by Champus and are not now recoverable. The issue of the government's right of subrogation is not before the Court, nor are these expenditures considered with regard to the assessment of any damages in this case. They only support the enormity of the circumstances. Future costs and care, according to the Court's understanding, are different matters. The analysis of the evidence includes the following findings:

Both parties presented evidence with regard to the reasonable cost of the child's care and maintenance. Each have appropriately reduced their estimates to a present value. In other words, none of the problems discussed in *Steckler v. United States,* 549 F.2d 1372 (10th Cir.1977), are confronted, and *Jones & Laughlin Steel Corp. v. Pfeifer,* — U.S. —, 103 S.Ct. 2541, 76 L.Ed.2d 768, controls the manner or means for reaching these damages.

Now for the purpose of discussion and perspective, the findings of Dr. Harold Greenstein are here reviewed. (See Pl.Ex. 19).

The child's care by necessity includes the services of physicians of varied disciplines. By example, it will include neurologists calculated for three visits per year at $45.00 per visit, equaling $135.00 per year; orthopedists calculated for two visits per year at $45.00, including radiology, equaling $90.00 per year; pediatrician calculated for three visits per year at $18.00 per visit, equaling $54.00 per year; internists calculated for three visits per year at $18.00 each, equaling $54.00 per year, to begin at age 17; neurosurgery calculated for one visit per year for shunt evaluation, including CT scan, equaling $325.00 per year; neurosurgery for shunt replacement is calculated for at least every four years at $5,000.00 for physician surgeon, assistant to surgeon, operating room, in-patient hospital stay; A urologist for IVP's, cystoscopy, and cystograms is calculated at $1,000 every two years.

There would be physical therapy calculated for twice a week at $18.00 per session, equaling $1872.00 per year until age 18; occupational therapy calculated for twice a week at $18.00 per session, equaling $1872.00 per year; drugs and prescriptions, including Tegretol and Detakene are calculated at $30.00 per month, equaling $360.00 per year; a nursing assistant for six hours a day, 42 hours per week, at $6.00 per hour, would equal $13,104.00 per year until age 18; a teacher's aide for eight hours a day, 200 days per year, at $5.00 per hour, would equal $8,000.00 per year.

While not covered by the evidence, the plaintiffs' expert suggests that there would be miscellaneous expenses, including transportation (compact automobile at $7,000.00) to terminate when the child reaches age 18, and of course transportation maintenance, including insurance, maintenance, etc., at approximately $1,048.00 per year; laundry for his case (in continent) at $24.00/month, or $2288.00 per year, terminating at age 19. In addition, the plaintiff's expert suggests a retrospective value of medical services of the mother. Again, in the interest of per-

spective, this is considered on the basis of six hours per day, 42 hours per week, at $3.00 per hour. Given consideration for at least four years' time, this would equal $26,208.00, and deservedly so.

While the Court appreciates that all of the foregoing are simply estimates, each appear imminent and necessary. A casual view suggests an aggregate expenditure in excess of $300,000.00. In this, the Court is aware of some disparity between the litigants' respective experts. As the Court perceives it here, the plaintiffs' expert is probably more inclusive with his experienced rationale of what is reasonably in store for the child, now and through future years. Conversely, the government's expert, Mrs. Patterson (Govt.Ex. L), is found to be wholly refreshing, pragmatic, and candid. Her contrast is principally geared to the witness's more conservative approach in reaching her judgments. There is considerable disparity as to the ultimate assessment of actual damages as each expert has reduced the figures to present value. As the Court sees it, the plaintiff's expert has given estimates as compounded sums of all expenditures and/or losses, the sum total of which becomes somewhat unrealistic. In the final analysis, the Court is probably more comfortable with Mrs. Patterson's reasoning, principally as she has reached and explained her own estimates, including present day investment policies.

It appears that both parties agree reasonably with regard to the cost of institutional care considered for the purposes of their reports and testimony, which is to commence at age 19. It is mutually agreed that this daily rate will be $79.00 per day, or $28,835.00 per year. Mrs. Patterson's estimate for these costs, at present value, is in the aggregate of $770,000.00.

The plaintiffs urge the sufferance of the loss of income based on a normal work life expectancy. This element does not appear to be in issue, and in the Court's view is allowable. The witnesses persuasively suggest a basis geared to an assumption of at least a high school education and entry into the labor force at age 20. Based on a 1979 salary projection of $9800.00, the experts reasonably calculate a growth rate which, as of today, would produce a similar income of $12,046.70. Using this as a basis, it follows that at age 20 a minimal income to be earned is in the aggregate of $14,252.00 per annum. Both witnesses use this figure as a basis for their respective projections. Mrs. Patterson's estimate for this loss is in the aggregate of $2,626,000.00.

In the final analysis, it should appear obvious, it is the Court's effort to reasonably calculate damages which will meet these needs, taking into account the necessary requisites, known expenditures, and losses, all in the interest of reducing to a present value an ultimate sum if reasonably invested today.

Accordingly, in light of all of the foregoing, the Court finds the sum of Nine Hundred Fifty Thousand Dollars ($950,000.00) to be a fair and reasonable sum to represent the present value of these expenses and losses. In doing so, the Court has again adopted the suggestions and findings of the government's evidence, arriving at a present market rate on the safest investment at 12% and applying an offset for future inflation of 2%, arriving at a below market discount rate of 10%. In sum, the Court's evaluation is best set forth at column 2 of Government Exhibit L.

With these calculations determined, the remaining element yet to be assessed or addressed is the reasonable compensation due the boy for his injury per se, as may be defined in the aspects of pain and suffering, physical or mental, and for disability. Indeed, contemplating compensation for the enormity of this lad's injuries and damages defies reason. Simply stated, no sum will ever compensate the child for such a loss. Considering the requisite elements, including sufferance of the disease process itself—the ruination of his brain—the Court sees it as the loss of any expectancy of even the simplest enjoyment of a natural life as we know it, yesterday, today, and God forbid the long tomorrow—nothing! Be it pain, suffering (mental or physical),

or disability, the child's injuries demand reasonable compensation. In the Court's view, the sum of One Million Dollars ($1,000,000.00) is assessed. This sum is modest but found here to be entirely fair and reasonable.

IT IS ACCORDINGLY ORDERED that judgment be entered for and in behalf of the plaintiffs, Jose M. Arvayo, a minor, by and through Jose L. Arvayo and Tina D. Arvayo, parents and natural guardians of Jose M. Arvayo, a minor, and against defendant United States of America, in the amount of One Million Nine Hundred Fifty Thousand Dollars ($1,950,000.00).